IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MADELINE CANDELARIO DEL MORAL<br><br>     Plaintiff,<br><br>v.<br><br>UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO<br><br>     Defendant. | Civil No. 08-1833 (SEC) |

**OPINION AND ORDER**

Before the Court are defendant UBS Financial Services Inc. of Puerto Rico's ("UBS") motion to set aside judgment under Rule 60(b) (Docket # 110), and plaintiff Madeline Candelario Del Moral's oppositions thereto (Docket # 112).[1] After considering the parties' submissions and the applicable law, the Court **DENIES** UBS's motion.

---

[1] These motions have been supplemented with the following submissions: (1) Candelario's Motion Requesting Prompt Decision With Respect To Defendant's Motion To Set Asside Judgment (Docket # 114); (2) UBS's Motion In Compliance With Court Order And For Additional Remedies (Docket # 121); (3) Candelario's Response In Opposition To Request For "Additional Remedies" (Docket # 126); (4) UBS's Reply To "Plaintiff's Response To Request For 'Additional Remedies'" (Docket # 128); (5) UBS's Amended Reply To "Plaintiff's Response To Request For 'Additional Remedies'" (Docket # 131); (6) Candelario's Sur-Reply (Docket # 135); (7) UBS's Motion To Inform The Status Of The Proceedings Before The Court Of First Instance (Docket # 137); (8) UBS's Motion To Stay Enforcement Of Judgment Without Supersedeas Bond (Docket # 138); (9) Candelario's Notice In Compliance With Court Order (Docket # 139); (10) Candelario's Opposition To Motion To Stay Enforcement Without Bond (Docket # 140); (11) Candelario's Motion To Revoke Rule 60 Certification Or In The Alternative To Deny The Rule 60 Motion In Order To Allow The Appeal To Proceed In This Case (Docket # 141); (12) UBS's Opposition To Plaintiff's "Motion To Revoke Rule 60 Certification Or In The Alternative To Deny The Rule 60 Motion In Order To Allow The Appeal To Proceed In This Case" (Docket # 142); (13) Candelario's Reply To Opposition To Motion To Revoke Rule 60 Certification Or In The Alternative To Deny The Rule 60 Motion (Docket # 157); (14) UBS's Motion For Evidenciary Determination On Damages (Docket # 161); (15) Candelario's Opposition to UBS's Renewal Of Motion For Hearing on Damages (Docket # 163); (16) UBS's Informative Motion (Docket # 164); and (17) Candelario's Informative Motion regarding Bankruptcy Court's Acceptance of Claim By Madeline Candelario (Docket # 165).

**Background**[2]

*The Related Litigation*: *Candelario v. Her Ex-husband*

This diversity tort-suit began over three years ago as a spillover of a longstanding divorce dispute between Candelario and her ex-husband, David Efron. Docket # 1. When the two lawyers parted ways in 2001, their 16-year marriage had yielded two daughters and a multi-million dollar marital estate. Docket # 50-2. Unsurprisingly, the question how to properly allocate those assets soon pitted Candelario and Efron against each other. Candelario alleged that Efron had remained in exclusive control of the assets, refusing her access to them. Docket # 50-2. In disagreement, Efron filed a separate suit to liquidate the marital estate. Docket # 110-1. Be it as it may, on May 3, 2001, the Superior Court of San Juan ordered Efron to pay $50,000 a month to Candelario "as enjoyment of assets and a cash amount that enables her to support herself." Docket # 110-1, p. 2. Candelario nonetheless would soon learn that the Superior Court's order constituted nothing more than a pyrrhic victory.

She returned to state court a few months later. Docket # 110-1, p. 27-28. Apparently, Efron had failed to make the requisite monthly payments, so Candelario requested the Superior Court to intervene. Id. The Court, however, sat on her motion for months, forcing Candelario to seek aid from the Puerto Rico Court of Appeals. Id. Thus, compelled to action by the higher court, the Superior Court denied Candelario's motion, concluding that her right to monthly payments was a provisional remedy applicable only until the divorce judgment became firm and final. Id.

Candelario appealed. Id. at p. 28. In siding with her, the Court of Appeals held that, even though Candelario could not claim a provisional remedy, she was entitled to enjoy her

---

[2] Although the factual background of this case has been discussed before (Dockets # 86, 105, 115 and 136), it is restated here for the sake of clarity.

share of the marital estate. Id.³ Candelario then returned to the Superior Court to request that the $50,000 monthly payments be reinstated until the marital estate was liquidated. Id. Although the Superior Court granted her request on May 28, 2005, it reduced the monthly payments to $20,000. Id.

Both Candelario and Efron appealed. Id. She requested the monthly payments to be increased to $50,000, and he challenged the Superior Court's legal conclusions. Id. The Court of Appeals, however, sided with Candelario, finding the record devoid of evidence to justify a reduction from the $50,000 monthly payment the Superior Court had ordered years earlier. Id. at p. 29. Thereafter, on Candelario's request, the Court of Appeals entered an amended judgment (the "Amended Judgment"), clarifying that the $50,000 monthly payments, together with the corresponding legal interest, were retroactive to June 4, 2001, the date in which the divorce judgment became firm and final. Id.

On October 9, 2006, the Superior Court issued an Order and Writ of Execution (the "Writ of Execution") against Efron. Docket # 38-6.  In pertinent part, the Writ of Execution directed the Marshal to attach assets "in an amount sufficient to respond for the principal sum of $4,160,522.61 interest over said sum at a rate of 10.50% annually from June 4, 2001 and up to the date of full payment." Id. The Writ of Execution also ordered third parties in possession of Efron's assets to turn them into cash proceeds sufficient to satisfy the Amended Judgment and then to send the cash proceeds to the Court. Id.

In disagreement, Efron requested a hearing, which the Superior Court held on November 13, 2006 (the "November 2006 Hearing"). Docket # 110-1, p. 30. There, Efron managed to persuade the Judge, who, among other things, verbally vacated the Writ of Execution. Id. Even though Candelario immediately moved for reconsideration, the Judge

---

³ According to Candelario, her share of these assets exceeds $38 million. Docket # 161-3.

denied her request in open court. Docket # 23-8. <u>The Judge, however, failed to enter a written order or to sign the minutes of the proceedings reflecting his verbal orders.</u> <u>Id.</u>

A few days later, Candelario reappeared before the Court of Appeals, this time, seeking to revoke the Judge's verbal order. Docket # 110, p. 31. But her motion was found premature and denied on jurisdictional grounds:

> We rule that a verbal notice of an interlocutory finding of the first instance court in a civil case does not constitute a notice that is required to activate the term provided by law to file a motion for reconsideration or a recourse of certiorari before the Circuit Court. <u>The notice that activates these terms must be set forth in writing and said document must be notified to the parties.</u>

Docket # 38, ¶ 16 (emphasis supplied).

Still dissatisfied, Candelario sought relief from the Puerto Rico Supreme Court, which also denied her *certiorari* petition, concluding that it lacked "the necessary documents reflecting what was ruled in the oral hearing before the First Instance Court on November 13, 2006." <u>Id.</u> at ¶ 20. Candelario's request for reconsideration was also denied. <u>Id.</u> at ¶ 21

After her setbacks at the appellate level, Candelario returned to the Superior Court, where she asked the Judge to sign and notify the minutes. Docket # 110-1, p. 31. Efron joined her request. Docket # 38-27, p. 17-18. In the interim, the case was reassigned to a different Superior Court Judge, who, on June 18, 2007, issued a written order indicating that time was needed to revise the record before adjudicating pending motions. <u>Id.</u>

Two days later, Candelario moved the Court of Appeals for an order requiring the Superior Court to execute both the Amended Judgment and the Writ of Execution. <u>Id.</u> On that occasion, able to entertain the merits of Candelario's request, the Court of Appeals ruled for her. <u>Id.</u> <u>It ordered the Superior Court Judge "to execute as soon as possible the orders, resolutions or proceedings necessary and required by [Candelario] . . . ."</u> <u>Id.</u> <u>The Judge did so on August 20, 2007, ordering "the sale of assets leading to the execution of the judgment as requested by [Candelario]."</u> <u>Id.</u>

5

Efron timely appealed the Sale Order, but the Court of Appeals reaffirmed. Docket # 38-27. It noted that Candelario's previous motion had been dismissed because the Superior Court's verbal order was not final (the minutes had not been signed) for appellate review purposes. Id. at p. 23. The Court then observed that her second motion was different because it had arisen from a written order by the Superior Court. Id. It also established that the Amended Judgment was firm and final, and thus, that the Superior Court could not revisit the issues adjudicated therein. Id. Efron's reconsideration request was denied on July 15, 2008, and the Sale Order eventually became firm and final. Docket # 110-1, p. 32.

Candelario's plight to collect the Amended Judgment as well as the monthly payments due thereafter continued, however. On May 20, 2009, she was back in state court petitioning the attachment of Efron's property in execution of the Amended Judgment. Docket # 110-1, p. 33. She alleged that the Amended Judgment was still outstanding and that overdue amounts totaled almost $6 million. Id. She also requested discovery regarding Efron's private assets. Id. Efron immediately opposed and again moved for a modification of the monthly payments due to Candelario. Id. at pgs. 33-34. On March 1, 2010, the Superior Court granted Candelario's discovery request and denied the modification Efron had requested. Id. at pgs. 34-35. Efron appealed. Id.

On April 30, 2010, the Court of Appeals issued a written opinion (the "2010 Court of Appeals Decision") restating that the doctrine of *res judicata* precluded a modification of Efron's monthly obligation to Candelario. Docket # 110, p. 38. Nevertheless, the Court also noted record entries showing that Candelario had received some moneys on account of Efron's debt and concluded that an evidentiary hearing was necessary to determine the exact amount of such debt. Id. at p. 36.[4] The Court therefore ordered the Superior Court to hold a

---

[4] According to a sworn declaration Candelario later submitted in State Court, during her ten year-long litigation with Efron she has received the following payments only:

- Three $50,000 monthly payments in 2006;
- One $50,000 monthly payment in 2007;

hearing "within a period of 60 days to elucidate the allegations of the parties with regard to the alleged payment or the alleged arrears in the obligation to pay $50,000 a month." Id. at p. 45.

The first hearing the Superior Court scheduled was continued because Efron's attorney failed to appear. Docket # 141, ¶ 15. Efron failed to show up at the second, and the same happened. Id. The Superior Court finally held the hearing on March 4, 2011, eight months after the Court of Appeal's 60-day deadline. Docket # 157-1. There, after listening to the parties, but without receiving any evidence, the Court made the following remarks:

> [A]ssuming as true the allegations of payment by [Efron] for the purpose of simplifying the dispute, it is very clear that there exists a minimum debt of $3,314,936.40, which corresponds to the difference between the amount that [Efron] should have paid through the present time and what he alleges having paid. Consequently, we rule, at minimum, that [Efron] is responsible for paying said amount, as well as the interest that has been accrued by said debt.

Id. at ¶ 8. The Superior Court then ordered Efron to answer Candelario's interrogatory regarding the whereabouts of all of his private assets. Id. at ¶ 12. A follow-up hearing was scheduled for May 26, 2011. Id. at ¶ 13. Efron, however, had other plans in mind.

A few weeks after the Superior Court's hearing, Efron filed a Chapter 11 bankruptcy petition, listing $105 million in assets against $34 million in liabilities. Docket # 137-1. His petition stated that the state court proceedings involving Candelario had been stayed and that his debt to her in connection with marital assets amounted to one dollar, which was "unliquidated, disputed, and contingent." Id. at pgs. 25 and 34.

Candelario filed a proof of claim for $ 38 million on August 2, 2011, one day after the applicable deadline had expired. Docket # 161-3. She then moved the Bankruptcy Court to

---

- The $351,178.31 received from UBS in 2007; and
- Two attachments of Efron's accounts at Banco Santander, one in 2009 and the other in 2010, totaling $608,827.95.

Docket # 126, ¶ 3.6.

accept her claim, explaining that she had not been notified about the deadline, because Efron had furnished the Bankruptcy Court with an incorrect mailing address. Docket # 163-1, ¶ 18. Candelario also stated that Efron had refused to produce documents needed to file an accurate proof of claim. Id. at ¶¶ 25-28.[5] In any event, as of today, the Bankruptcy Court has yet to adjudicate Candelario's proof of claim, and Efron has yet to confirm a Chapter 11 plan. Therefore, with the state court proceedings stayed pending the outcome of Efron's bankruptcy, and without a determination about Candelario's proof of claim, her 10-year long quest to access her rightful share of the marital estate appears far from over.

*The Present Suit: Candelario v. UBS*

Back on October 9, 2006, when the Superior Court entered the Writ of Execution against Efron, his investments with UBS were valued well above $11 million. Docket # 31-4. Accordingly, on October 20, 2006, the Superior Court Marshal required UBS to freeze Efron's accounts, to liquidate investments totaling $4,160,522.61, and to remit the proceeds to the court in satisfaction of the Amended Judgment. Docket # 23, ¶ 4; see also Docket # 38-5. Although UBS froze Efron's accounts immediately, on October 27 it filed a "Motion to Clarify," stating that Efron lacked enough cash to satisfy the amount set forth in the Writ of Execution and requesting instructions regarding which of his assets to sell. Docket # 38-9. UBS moved the Superior Court to address the matter at the November 2006 Hearing which had been scheduled to hear Efron's opposition to the Writ of Execution. Id.[6]

The Superior Court held the hearing as scheduled, but UBS failed to appear. As stated above, at the November 2006 Hearing, Efron persuaded the Judge to verbally vacate the Writ of Execution, and Candelario immediately began appellate efforts to vacate the verbal order.

---

[5] The Bankruptcy Court accepted Candelario's proof of claim over Efron's 22-page objection. Docket # 165-1. In so doing it stated: "[i]t is clear from the certificate of service . . . that [Candelario] did not receive proper service of the Chapter 11 Notice to Creditors . . . ." Id.

[6] UBS also questioned the calculations used to arrive at the $4 million figure underlying the Writ of Execution and alleged that the principal amount Efron owed was much lower. Id. at ¶¶ 7-8.

8

Despite the Superior Court's order, however, Efron did not request UBS to unfreeze his assets, and UBS did not do so.

Things changed in February 2007. <u>On the 15th day of that month, Efron requested UBS to release all of his assets</u>. Docket # 23, ¶ 24. To support his petition, Efron provided UBS with copies of the following documents: (1) <u>the unsigned minutes of the November 2006 Hearing</u>; (2) the motion Candelario filed with the Court of Appeals requesting the verbal order to be revoked; (3) the Court of Appeals' judgment denying Candelario's motion as premature; (4) Candelario's *certiorari* petition with the Puerto Rico Supreme Court; and (5) the Supreme Court's resolution denying Candelario's petition. Id.

<u>UBS accommodated Efron's request the next day, and Efron withdrew most of his assets swiftly.</u> Id. In allowing Efron to deplete his assets, UBS ignored letters from Candelario's attorney stating that the Judge's verbal order was still appealable because the minutes reflecting the order had neither been signed nor notified to the parties. Docket # 38-19. UBS also disregarded the Court of Appeals order as well as the Supreme Court resolution validating the attorney's contentions. Candelario's attorney restated her position in further correspondence (including a copy of Candelario's reconsideration motion filed with the Supreme Court) but to no avail. Dockets # 38-20 & 38-21.

As stated previously, <u>Candelario eventually prevailed</u>, and the Superior Court was ordered " to execute as soon as possible the orders, resolutions or proceedings necessary and required by [Candelario] . . . ." Docket # 38-27, pgs. 17-18. <u>Acting on the Superior Court's instructions, UBS sold the assets that Efron still held with them</u>. Docket # 38-26. Then, with the cash proceeds on hand, UBS applied $810,071 against the outstanding balance of a line of credit it had extended to Efron. Id. And on September 4, 2007, <u>it issued a $351,783 check to Candelario on account of the remaining proceeds.</u>

This suit followed in August 2008. Docket # 1. In her complaint, Candelario alleged <u>that UBS negligently released Efron's assets</u> and that the Amended Judgment is still

outstanding. Id. Thus, she requested UBS to satisfy the Amended Judgment uncollected balance of $3,808,739.48, plus interest thereof at 10.5% per year. Id.[7] On its part, UBS denied any wrongdoing and decided against joining Efron to the case. Docket # 9.

After a seven-month discovery period, the parties filed cross motions for summary judgment. Dockets # 23 & 31. UBS contended that Candelario's suit was time barred and that its actions had been reasonable under the circumstances. Docket # 23. Candelario opposed and filed her own dispositive motion restating the allegations underlying her complaint. Docket # 31. Replies and sur-replies ensued (Dockets # 43, 54, 56, 59, 67-69, and 72), but despite its multiple submissions, UBS never argued that the Amended Judgment had been satisfied nor that Efron had made any payments to Candelario. Indeed, the record before the Court today is devoid of any evidence indicating that UBS requested information from Efron regarding payments made to Candelario.

This Court decided the motions on January 13, 2010, <u>concluding that UBS had acted negligently in releasing Efron's assets based on an interlocutory verbal order by the Superior Court.</u> Docket # 86.[8] Specifically, the Court found that "the minutes of the hearing were never notified to the parties or signed by the Judge. . . . *[S]uch an order is not final,* and thus enforceable, until the Courtroom Clerk issues the Minutes for the proceedings, the Judge signs the same, and the parties are notified . . . ." Id. at p. 18. (emphasis in original). As to damages, the Court noted that "the Superior Court awarded [Candelario] $4,160,522.61, and she only received $351,78.19." Id. at p. 21. Accordingly, the Court netted those amounts and held UBS liable for the balance of $3,808,239.48, stating that such sum represented the payments Candelario had not received. Id.

---

[7] This sum excluded the $351,783 already collected from UBS.

[8] Among other things, this ruling was based on Puerto Rico's Rule of Civil Procedure 65.3. Please refer to the Court's Opinion and Order available at Docket # 86 for a detailed discussion of this issue.

UBS appealed (Docket # 90), and Candelario moved for reconsideration as to the damages award, alleging that the Writ of Execution had been intended to provide her with an alternative source of funds to collect Efron's future unpaid obligations (Docket # 93). On April 4, 2010, this Court denied Candelario's motion because "the record clearly shows that the October 2006 Order and Writ of Attachment did not impose any additional obligation upon UBS aside from the attachment of certain properties in an amount sufficient to [pay] . . . $4,160,522.61 plus interest . . . ." Id. at p. 6. The Court also noted that its jurisdiction to award damages to Candelario was limited to "the amount [she] would have received pursuant to the October 2006 Order and Writ of Attachment but for UBS's negligent actions." Id. at p. 7. Dissatisfied, Candelario cross-appealed. Docket # 106.

On June 4, 2010, three weeks before the due date for its appellate brief, UBS moved this Court to set aside the damages award pursuant to Rule 60(b). Docket # 110. In essence, UBS alleged that the 2010 Court of Appeals Decision revealed that Candelario had received payments from Efron, which contradicted her position in this forum. Id. Candelario timely opposed. Docket # 112. Nevertheless, in light of the implications of UBS's allegations, the Court preliminarily stated that it was inclined to partially grant UBS's motion. Docket # 115, p. 3. The Court also expressed interest in evidence showing that Candelario "may have received funds from Efron since 2001, satisfying the amounts owed in this suit." Id. But because the Superior Court had scheduled an evidentiary hearing on the issue, this Court held in abeyance UBS's motion and ordered the parties to keep it informed about the state court proceedings. Id. at p. 4.[9]

The Superior Court delayed eight months in holding the evidentiary hearing. In the meantime, UBS requested this Court to reopen the discovery process to allow new interrogatories, a document request, and a deposition to Candelario. Docket # 121, ¶ 12. It also requested permission to subpoena and to depose Efron. Id. The Court, however, found

---

[9] Based on this ruling, the Court of Appeals for the First Circuit stayed the parties' cross-appeals. Docket # 119.

"that ordering discovery at th[at] time [was] a waste of resources, especially considering that the issue of payments, if any, made by Efron to [Candelario was] . . . before the [Superior Court]." Docket # 136, p. 2.

The Superior Court finally held the long awaited hearing on March 4, 2011. Docket # 157-1. <u>But before it could enter judgment, Efron filed his bankruptcy petition and stayed the proceedings.</u> Docket # 137. Candelario and UBS's active motion practice has continued thereafter. <u>See</u> Dockets # 138-142, 157, 161, 163-165. Although numerous, the parties' submissions are easily summarized: UBS continues pressing for a hearing on damages, and Candelario continues insisting that the Amended Judgement remains unpaid.

At any rate, the parties' additional submissions have allowed the Court to consider their respective positions in light of a more developed record.  This time around, the Court has had the opportunity to hear the parties' present and defend their cases at an in-chambers hearing (Docket # 159), and the record has been supplemented with relevant entries from proceedings at both the state and bankruptcy courts. Dockets # 110-1 and 157-1. Under this scenario, further delaying a final decision in connection with UBS's Rule 60(b) motion is unnecessary.

**Standard of Review**

Fed. R. Civ. P. 60(b) provides federal courts with discretion to "relieve a party . . . from a final judgment, order, or proceeding" if any of six different factors is met. As relevant here, these factors include  (i) "newly discovered evidence which by due diligence could not have been discovered"; (ii) "fraud . . . misrepresentations, or other misconduct of an adverse party"; (iii) "the judgment has been satisfied . . . or it is no longer equitable that [it] should have prospective application"; and (iv) "any other reasons justifying relief from the operation of the judgment." <u>Id.</u> The inquiry under these factors is two-fold: courts must "balance the importance of finality against the desirability of resolving disputes on the merits." <u>Farm Credit Bank of Baltimore v. Ferrera-Goitia</u>, 316 F.3d 62, 66 (2003). And the aim of the analysis is

to determine where the equities of the situation lie. See George P. Reintjes Co., Inc. v. Riley Stoker Corp., 71 F.3d 44, 49 (1st Cir. 1995).

The road to success in a Rule 60(b) motion is rather steep, however. See Karak v. Bursaw Oil Corp., 288 F. 3d 15, 19 (1st Cir. 2002). The movant must show, "that his motion is timely; that exceptional circumstances exist favoring extraordinary relief; that if the judgment is set aside, he has the right stuff to mount a potentially meritorious claim or defense; and that no unfair prejudice will accrue to the opposing parties should the motion be granted." Id. Accordingly, "relief under Rule 60(b) is extraordinary in nature and […] motions invoking that rule should be granted sparingly." Id.

**Applicable Law and Analysis**

In this case, UBS's Rule 60(b) motion pointed to the 2010 Court of Appeals' Decision which allegedly unearthed evidence calling into question the damages award Candelario obtained in this suit. Docket # 110. UBS thus argued that the 2010 Court of Appeals Decision (1) constituted newly discovered evidence; (2) evinced fraud, misrepresentations, or misconduct by Candelario; (3) raised the possibility that the judgement may had been satisfied, which in turn made its prospective application no longer equitable; and (4) proved that exceptional circumstances justify relief from the judgment. Docket # 110. Id. The Court will address each of these arguments in turn.

*Rule 60(b)(2): Newly Discovered Evidence*

The analysis begins with UBS's contentions under the newly discovered evidence prong of Rule 60(b). To pass muster under this prong, as a threshold matter, a movant must show that the evidence is both new and insusceptible to earlier discovery through due diligence. Mitchell v. United States, 141 F.3d 8, 18 (1st Cir. 1998). Accordingly, the movant "must offer a convincing explanation as to why he could not have proffered the crucial evidence at an earlier stage of the proceedings." Karak, 288 F. 3d at 19-20. But no matter how convincing the explanation, it will fail if the alleged "new" evidence was available in

records the movant possessed prior to judgment. See U.S. Steel v. M. DeMatteo Const. Co., 315 F.3d 43, 52 (1st Cir. 2002). The same will happen when the movant disregards a witness whom it knew had information related to the "new" evidence. Parrilla-Lopez v. U.S., 841 F.2d 16, 19-20 (1st Cir. 1988).

UBS explains that it "did not learn [about the new evidence] prior to the entry of Judgment because Candelario repeatedly claimed, both in her depositions and court filings, that Efron had paid her nothing and that the only amount that she had recovered was $351,783.19 from Efron's account at UBS-PR." Docket # 110-1, p. 11. This explanation does not carry the day.

First, the evidence supporting UBS's motion is all but new. The 2010 Court of Appeals Decision that UBS has offered to support its motion shows as much. There, in recounting events at the 2006 Superior Court Hearing, the Court of Appeals stated: "Candelario testified at the hearing. She admitted that she had received from Efron several substantial sums since the divorce was decreed." Docket # 110-1, p. 30.[10] UBS knew that the November 2006 Hearing would take place; after all, UBS had requested the Superior Court to address at that time its motion seeking instructions in connection with the Writ of Execution. Docket # 38-9. Moreover, although UBS apparently failed to appear at the hearing, it is undisputed that it had access to the hearing transcripts. See Dockets # 23-37-42.[11] UBS also had access to the minutes of the proceedings, which contained the so-called evidence that UBS now heralds as new. Docket # 23-8.

Second, UBS had over seven months of discovery to corroborate Candelario's version of the facts. Docket # 12. During this time, UBS could have resorted to Efron or his attorneys for information on this matter, but the record contains no evidence as to whether it did. To the

---

[10] As stated previously, in a sworn declaration Candelario admitted having received $1.16 million from Efron. This amount represents a *de minimis* fraction of the $38 million she claims as her share of the marital estate.

[11] Upon Efron's request, the Superior Court allowed the proceedings to be recorded. Id. Hence, UBS could have also requested a copy of such recording.

contrary, the record suggests that UBS first attempted to procure evidence from Efron in January 2011, when, as part of its efforts to vacate the then one-year old judgment currently in question, UBS requested permission to subpoena and depose Efron. Docket # 121, ¶ 12. Moreover, UBS does not, and cannot, contend that Efron's whereabouts were unknown before the entry of judgment. Among other things, Efron has practiced law out of San Juan and has been extremely active in this District as well as in the Commonwealth courts since the beginning of this case. And, as a former client, UBS surely had all of Efron's personal contact information.

In sum, UBS's newly discovered evidence claim is flawed. The information UBS heralds as "new" is all but new. Moreover, UBS can blame no one but itself for failing to address the "new" evidence before the entry of judgment. UBS had records reflecting the alleged new evidence as well as access to witnesses who knew about such evidence. Therefore, the relief UBS requests is precluded by U.S. Steel, 315 F.3d at 52 as well as by Parrilla-Lopez, 841 F.2d at 19-20.

UBS's claim falters on other grounds as well. For a Rule 60(b) motion to be granted upon newly discovered evidence, the evidence must be of such a nature that it would probably change the judgment. Mitchell, 141 F.3d at 18. Here, UBS's "new" evidence, if credited, would not have that effect. As stated above, UBS contends that the "newly discovered" evidence may show that the damages award Candelario received is incorrect. The Court premised that award on two grounds: (1) the Writ of Execution, which was firm and final, requiring UBS to liquidate Efron's assets to satisfy the Amended Judgment; and (2) the amount UBS paid to Candelario. Docket # 86. In other words, the Court awarded Candelario "the amount [she] would have received pursuant to the October 2006 Order and Writ of Attachment but for UBS's negligent actions." Docket # 105, p. 7. Under Puerto Rico tort law, the same result would follow even if UBS's "new" evidence were to be considered.[12]

---

[12] This is a diversity tort-suit; therefore, Puerto Rico law controls. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

15

The Commonwealth tort law system is of a remedial nature. Correa v. A.F.F., 83 P.R. Dec. 144, 154 (1961). It seeks to place the injured party into the condition she would have been had the negligent breach not occurred. Rivera-Colon v. Diaz-Arocho, 165 P.R. Dec. 408, 427 (2005). Put differently, "[c]ivil liability is, precisely, the duty to redress the aggrieved party, fixing an economic value on the damages suffered." Garcia-Pagan v. Shiley Caribbean, etc., 122 P.R. Dec. 193, 206, 22 P.R. Offic. Trans. 183 (1988). To effectuate this purpose, courts are instructed to provide a liberal construction to the applicable statutory framework. Id. Therefore, "[t]he manner of redress shall be determined by the courts taking into consideration the particular characteristic of each case." Rodriguez-Cancel v. A.E.E., 116 P.R. Dec. 443, 454, 16 P.R. Offic. Trans. 542 (1985).

Today, UBS cannot challenge the Amended Judgment or the Writ of Execution, both became firm and final years before the beginning of this case. For this reason, UBS's "newly discovered" evidence is relevant only as to the events occurring after the negligent release of Efron's assets. So viewed, UBS's argument is that, even though it negligently released Efron assets, Candelario suffered no damages because she allegedly collected the Amended Judgment. This allegation is questionable, but even if true, the argument misses the mark.[13]

Under the applicable legal authority, in awarding damages to Candelario, the Court needed to place her in the position she was before UBS's negligent conduct. At that juncture, UBS held over $11 million in Efron's assets, and Candelario had the right to receive a little over $4 million of them. Due to UBS's negligence, however, Efron was able to deplete his UBS accounts, so that Candelario only received $351,78.19. Placing Candelario where she was before UBS's negligence therefore required nothing more than a simple arithmetic calculation, with the subsequent relationship between Candelario and Efron having no bearing on the final result. For this reason, when, how, or how much money Candelario finally receives from Efron is irrelevant in this case, and UBS's "newly discovered" evidence does it no good.

---

[13] The record contains credible evidence showing that Candelario has received from Efron only a *de minimis* fraction of what she may be entitled to.

UBS has failed to address the latter point altogether. Rather, it has obfuscated matters in an attempt to intertwine its obligations to Candelario with those of Efron. UBS and Efron's obligations to her, however, derive from completely different sources and are independent from one and other. UBS attempts to deviate attention from this fact, by arguing, among other things, that the Court has not allowed it to introduce evidence contesting Candelario's damages award. Docket # 161. Nevertheless, UBS has had more than nine months after entry of judgment to direct the Court to evidence showing that the award was incorrect, and all that it has brought forth is the "newly discovered" evidence highlighted above. This, coupled with UBS's desperate eleven-hour request to subpoena and depose both Candelario and Efron, shows its jeremiad to be nothing more than an ill-advised attempt to sidestep the effects of a failed litigation strategy. This Court will never sanction gamesmanship of this sort no matter how well it comes cloaked.

*Rule 60(b)(3): Fraud, Misrepresentations, or Misconduct*

UBS's contentions under Rule 60(b)'s "fraud, misrepresentations, or misconduct" prong are equally flawed. Relief from judgment under this prong requires clear and convincing evidence of misconduct as well as of a detrimental impact on the movant's ability to fully and fairly present his case. Anderson v. Cryovac, Inc., 862 F.2d 910, 926 (1st Cir. 1988). As a general principle, however, a movant will fail under this prong "where he or she has access to disputed information or has knowledge of inaccuracies in an opponent's representations at the time of the alleged misconduct." Ojeda-Toro v. Rivera-Mendez, 853 F.2d 25, 29-30 (1988); see also Karak, 288 F. 3d at 19-20 (denying relief because movant knew the information in controversy); Geo P. Reintjets Co., 71 F. 3d at 49 (denying relief where movant failed to use available discovery to uncover the alleged misconduct).

In this case, UBS alleges that Candelario's damages award was premised on the representation that "the Superior Court awarded [Candelario] $4,160,522.61, and she only received $351,783.19." Docket # 110, p. 14. UBS further contends that Candelario sought recovery from UBS "based on the same false claim[], while omitting any mention of the

substantial payments discussed in the [2010 Court of Appeals] Decision." Id. Nevertheless, the Court already established that this information, which is questionable, was available to UBS before the entry of judgment. This suffices to deny UBS's claim.

Regardless, UBS has also failed to provide the Court with clear and convincing evidence about the alleged misconduct. For example, according to UBS, paragraph 16 of Candelario's complaint falsely states that "UBS's negligence and/or illegal actions deprived plaintiff . . . of the court ordered payment of $50,000 per month until the liquidation of the Community Property regime." Docket # 110, p. 13. But Candelario explains away the alleged misrepresentation by correctly pointing out that UBS completely distorted the import of this paragraph by omitting most of its text. Docket # 112, pgs. 11-12. She has offered similar explanations with regard to the other instances of misconduct alleged by UBS. Id. at pgs. 12-13.  Accordingly, UBS falls far short of meeting the requisite burden for its misconduct claim to be granted.

> *Rule 60(b)(5) and (6): Prospective Application of the Judgment Is No Longer Equitable; and Any Other Reason Justifying Relief From The Operation of The Judgment*

UBS's claims under the remaining prongs of Rule 60(b) can be discarded out of hand. Under these prongs, UBS argues that the fact that the Amended Judgment "has been partially, if not completely, satisfied provides an independent reason to set aside the judgment under Rule 60(b)(5) and (6)." Docket # 110, p. 12. As discussed above, whether the Amended Judgment has been satisfied plays no role in this case, because UBS's obligation to Candelario arises from a completely different and independent source. Therefore, UBS's argument fails on this front also.

*Equitable Considerations*

Equitable considerations play a pivotal role in the Rule 60(b) inquiry. George P. Reintjes Co., Inc., 71 F.3d at 49. Brief remarks about the Court's views in this regard are therefore in order.

Over the last ten years, Candelario and Efron have been hard at battle over a multi-million dollar marital estate, with no ending near in sight. Call it luck or call it coincidence, but the record shows that each time that Candelario has appeared to make inroads on Efron, he has managed to turn the tables on her. The UBS episode is just one of many examples.[14]

Candelario suggests that Efron's bankruptcy filing is another example. The Superior Court's resolution, issued 20 days before Efron's bankruptcy petition stating that he owes Candelario as much as $3.3 million in overdue monthly payments (without accumulated interest), as well as the Superior Court's order requiring Efron to disclose the whereabouts of all his assets, lend credence to these allegations. So does the fact that Efron's bankruptcy schedules listed three times as many assets ($105 million) than liabilities ($34 million). Of course, Candelario's quandary with Efron, although related to this suit, is not a dispositive factor. One thing is clear though, ten years after her divorce, despite many efforts and expenses, Candelario has been unable to obtain a binding judicial determination as to her share in a pool of marital assets estimated by some to exceed $70 million.

In contrast, UBS has nobody to blame but itself for its current predicament. First, in its haste to accommodate the whims of a wealthy client, UBS turned a blind eye to obvious red flags. Then, in this suit, UBS failed to conduct proper discovery and adopted a failed litigation strategy. Now, in a final effort to avoid the consequences of its own doings, UBS

---

[14] Candelario alleges that UBS and Efron have been acting in tandem to frustrate her collection efforts. Docket # 163, ¶ 2.1. Specifically, she argues that the issues now pending have "arisen based on unsupported speculation promoted by UBS's client, David Efron, whose record of lack of candor before the courts has been amply documented." Id. To support her remarks about Efron, Candelario offers a laundry list of cases in which Efron apparently has been sanctioned for his actions in court. At this juncture, however, the Court has not been placed in a position to consider Candelario's allegations regarding UBS and Efron.

...
...
...
...

has presented to the Court a distorted account of the evidence of record as well as a defective analysis of the controlling legal authority.

Under these circumstances the equities of the case are easily ascertainable. Accordingly, UBS's Rule 60(b) motion fails on this ground too.

**Conclusion**

For the foregoing reasons, UBS's Rule 60(b) motion is **DENIED**. Nevertheless, the parties have brought to the Court's attention that the Writ of Execution figure of $4,160,522.61 already included the interest accumulated before October 6, 2006, the date in which the Writ was issued. The Court will therefore amend its prior judgment accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 4th day of October, 2011.

s/ *Salvador E. Casellas*
SALVADOR E. CASELLAS
Senior U.S. District Judge