THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MADELINE CANDELARIO DEL MORAL,

     Plaintiff,

         v.                            CIVIL NO. 08-1833 (PAD)

UBS FINANCIAL SERVICES
INCORPORATED OF PUERTO RICO,

     Defendant.

## OPINION AND ORDER

Madeline Candelario del Moral claims to have suffered damages as a result of the negligence of UBS Financial Services Incorporated of Puerto Rico in releasing certain accounts and paying off a credit line in violation of a writ of execution of judgment issued by the Court of First Instance of Puerto Rico ("CFI") in October 2006. Trial is scheduled to start on December 4, 2014. In preparation for trial, the Court asked the parties to submit briefs on four (4) damage-related issues (Docket No. 279). They have done so (Docket Nos. 281, 283, 291 and 292). Having carefully studied the arguments presented in support of the parties' positions, the Court rules as follows:

1. The state court has not made a determination on Candelario's share of the community property. That question will be answered as part of the ongoing liquidation process in that court. Considering the nature of such process, adjudication of that issue here would be inappropriate.

2. One of the accounts subject to the attachment order – JX-60059 – was validly pledged as collateral to a stateside entity, UBS Bank USA of Utah, for loan account 5V50203. It does not, however, seem that such entity requested UBS to specifically act on those accounts when they were attached in October 2006 or thereafter. Under those circumstances, UBS should not have debited or deducted funds from the account(s) prior to liquidating balance(s) to comply with the CFI's order of August 2007.

3. The 10.50% rate is a component of the obligation that UBS allegedly infringed. After entry of judgment in the present litigation, the federal interest rate would apply to any

        unpaid amount (plus the 10.50 % interest), until judgment is satisfied.

4.    UBS may deduct from any damage award $1,002,640.00 corresponding to (a) $215,000.00 that Candelario received from Mr. David Efrón between June 2001 and August 2002; (b) $200,000.00 that Candelario received from Mr. Efrón between November 2006 and January 2007; and (c) 587,640.00 ($608,827.00 less fees) that Candelario recovered from Mr. Efrón's accounts in Banco Santander in 2009 and 2010. The amounts Candelario received in 2001-2002 and 2006-2007 do not pay interest; the amounts from Banco Santander pay 10.50% interest up to the corresponding attachment date(s).

The grounds from these rulings follow.[1]

## I.    __BACKGROUND__[2]

In 1983, Candelario and Efrón were married constituting a legal conjugal partnership. In May 2001, the marriage ended in divorce. The same month, the CFI ordered Efrón to pay Candelario a monthly payment of $50,000.00 as part of her participation in the assets of the previously constituted conjugal partnership.

In March 2005, the CFI decreased the monthly payment to $20,000.00, specifying that it would be retroactive to June 4, 2001, when the divorce decree became final and unchallengeable. In January 2006, the Puerto Rico Court of Appeals reviewed the CFI's decision, increasing to $50,000.00 the monthly amount to be paid by Efrón. In February 2006, it issued an Amended Judgment to provide that legal interest on this obligation would be retroactive to June 4, 2001.

Pursuant to the Amended Judgment, in October 2006, the CFI issued an Order and Writ of Execution providing, among other things, for the attachment of Efrón's real and personal property.

---

[1] The rulings assume UBS is liable to Candelario. In making this assumption, the Court has not prejudged the merits of the liability issue to be adjudicated in this case. Such determination will be made after examination of evidence to be presented at trial.

[2] A comprehensive recitation of the background of this case can be found in Candelario v. UBS, 699 F.3d 93 (1st Cir. 2012), and Candelario v. UBS, 691 F.Supp.2d 291 (D.P.R. 2010).

The third parties were to retain the property and to remit to the CFI funds sufficient to satisfy the principal sum of $4,160,522.61 with interest at the rate of 10.50% per annum from June 4, 2001. The same month, UBS was served with the Order and attached Efrón's three (3) accounts: JX-60059, WR-00855, and JU-50203.

In February 2007, UBS released the accounts, which at that time had assets worth over $11,000,000.00. Thereafter, Efrón made withdrawals such that by July 2007 the value of the accounts had decreased to $1,155,367.71. In August 2007, the CFI issued an Order for the Sale of Assets, requiring UBS to sell and liquidate Efrón's assets in the accounts until the amount of $4,160,512.61 was reached; to issue a check payable to Candelario for that amount; and to maintain Efrón's accounts frozen until the amount of interest accrued on the debt as of payment date was calculated and until the CFI otherwise ordered.

In September 2007, UBS liquidated the securities; wired $810,071.87 to UBS Bank USA to pay a loan that entity had made to Efrón; and paid Candelario the remaining $351,783.13. Candelario claims UBS was negligent in releasing the accounts in violation of the October 2006 Order, and seeks payment of $3,808,739.48[3], plus interest over that sum at the rate of 10.50% retroactive to June 2001.

## II.   DISCUSSION

### 1.   Adjudication in this case of Candelario's alleged share of the community property being liquidated in state court would be inappropriate.

UBS asserts such evidence should be presented. It points to the Court's observation at Docket No. 209, p. 2 that Candelario should not receive more than what she would be entitled to

---

[3] That is, $4,160,512.61 - $351,783.13.

receive as part of her participation in the marital estate, and on that ground, characterizes the evidence as relevant to the issue of damages to be adjudicated in this case (Docket No. 283 at p. 21).

In Puerto Rico, damages consist of compensation in money for loss caused by the wrongful act or omission of another.  García v. Shiley Caribbean, 122 D.P.R. 193, 205 (1988).  They seek to make a party whole, placing her in the position she would have occupied had the wrong not occurred.   Rivera Rodríguez v. Tiendas Pitusa, Inc., 148 D.P.R. 695, 700 (1999).  Their nature reflects the obligation from which they derive.[4]  They serve to restore injured parties, not to reward them.  Thus, they are compensatory rather than punitive, indemnifying the aggrieved party for a loss suffered rather than as punishment for a defendant's blameworthy or reprehensible conduct. Noble v. Corporación Insular de Seguros, 738 F. 3d 51, 54 (1st Cir. 1984); Carlos J. Irizarry Yunqué, Responsabilidad Civil Extracontractual, 343 (7th Ed. 2009).

By Candelario's account, UBS' obligation originates in the CFI's October 2006 writ and order of execution to secure payment of *interim* relief to her, as advances against her share of the community property to be ultimately liquidated in state court.  Given the *interim* nature of the relief to be secured by the Order, it is not to be confused with the ultimate adjudication of the former spouses' share in community property.  For that reason, the determination of whether Candelario has received her share of the estate must await conclusion of the ongoing liquidation process.

---

[4] This conception of relief underlies the description of specific performance as the preferred remedy in Puerto Rico, unless inadequate to put the aggrieved party in the same position as performance would have.  Rivera-Colón v. Arocho, 165 D.P.R. 408, 429-430 (2005); Rodríguez-Cancel v. A.E.E., 116 D.P.R. 443, 454-455 (1985).

Such processes follow an orderly sequence linked to the nature of the issues they must address, prior to a ruling.  Those issues derive from the particular characteristics of the economic regimes to which the estate is subject during marriage, and following divorce.  In the absence of a valid pre-nuptial agreement, the legal conjugal partnership governs the spouses' economic relationship during marriage.  The partnership lasts while the marriage lasts, beginning on the day of marriage and ending on the day marriage concludes.  At that point, it dissolves, giving way to a regime of community property.  Montalván v. Rodríguez, 161 D.P.R. 411, 420-423 (2004); Asociación de Residentes v. Arzuaga, 160 D.P.R. 289, 305-306 (2003).

That regime is transitional, and extends until properly liquidated.  Montalván, 161 D.P.R. at 421.  It provides former spouses with an abstract share over the prior marital estate rather than a concrete share over each of the assets in the estate.  BL Investment, Inc. v. Registrador, 181 D.P.R. 5, 14 (2011); Pagán-Rodríguez v. Registradora, 177 D.P.R. 522, 529-530 (2009).  Its liquidation requires a detailed inventory or identification of conjugal and private assets and liabilities, as well as of fraudulent conveyances, donations and obligations paid for by the partnership; valuation and appraisal; and payment of debts.  BL Investment, 181 D.P.R. at 15-16.  The process concludes with the division and segregation of the property owned into undivided shares so as to vest in each of the co-owners, exclusive title based on their respective shares to a specific portion in lieu of their undivided interest in the estate as a whole.  Vega v. Soto, 164 D.P.R. 113, 127-128 (2005); Rosa-Resto v. Rodríguez-Solis, 111 D.P.R. 89, 90 (1981); Janer Vila v. Tribunal, 90 D.P.R. 281, 301-302 (1964).

Considering the dynamic nature of these elements, former spouses are entitled to *interim* payments against the share they will be assigned when the issue is ultimately adjudicated.  Soto-

Candelario-Del Moral v. UBS
Civil No. 08-1833 (PAD)
Opinion and Order
Page 6

López v. Colón-Meléndez, 143 D.P.R. 282, 291-292 (1997).  The *interim* obligation is autonomous.

Albeit related, it is nonetheless separate from determinations emanating from the final accounting,

to be determined and adjusted at liquidation.  Montalván, 161 D.P.R. at 438 n. 10.  Consistent with

these substantive principles, the Puerto Rico Court of Appeals rejected Mr. Efrón's attempts to

introduce evidence that Candelario has received more than she is due from her share of the

communal property, in challenging the propriety of *interim* payments to her.  See, Candelario v.

Efrón, KL RX 2010 00024 (April 30, 2010), in which the Puerto Rico Court of Appeals held as

follows:

> Candelario claims that Efrón is not meeting his obligation to pay her $50,000 a month,
> according to the Judgment of this Court of February 16, 2016.  Efrón, on his part, alleges
> that he has more than met his obligation. . . . [and]. . . . that the conjugal mass has already
> liquidated.
>
> [T]he matter is subject to an adjudication still pending before another Part of the First
> Instance Court, which is considering the evidence in this regard.  This is not the first time
> that this has been clarified to Efrón. . . .The same decision has been reiterated on several
> occasions by other panels before this same Court.

See, Docket No. 110, Exh. 1, p. 36.

The same principle applies to, and bars UBS' proposal to present in this case what Mr.

Efrón was not allowed to present while challenging *interim* relief to Candelario in state courts.

Until a definite ruling is made in the state court on this issue, attempts to adjudicate Candelario's

share in this proceeding would be similarly inappropriate.

Notwithstanding this decisional framework, UBS alleges that evidence that Candelario has

already received her share of community property should be permitted because "key issues have

already been decided, and the remaining issues can be decided expeditiously."  (Docket No. 283

at p. 22).  Yet that is not how Candelario describes the process.

On June 5, 2001, the liquidation case began.  In 2010, the CFI reiterated that the division of the community property would be done in five (5) stages, as follows:

**Stage 1.**  Discovery aimed at determining which of five (5) particular corporations and partnerships are part of the communal property and which are privately owned by Mr. Efrón. Although each of these five entities were created during the marriage, Mr. Efrón nonetheless has questioned whether they form part of the community property.

**Stage 2.**  Discovery related to the increase in value of those entities adjudged as privately owned by Mr. Efrón. This would be followed by a ruling determining the value of those increases.

**Stage 3.**  Discovery aimed at assessing the fruits, income and interest pertaining to all property determined to be "privately owned property.

**Stage 4.**  Identification and valuation of the entirety of the community property of plaintiff's partnership with Mr. Efrón.

**Stage 5.**  Determination of the value of certain assets and interest thereon which plaintiff understands to be encompassed in the community property, but as to which no discovery was done during the earlier stages.  Upon completion of these five stages, the state court will be in position to proceed to the division of the community property.

See, Docket No. 281 at pp. 13-14.

According to Candelario, the only determination which has been made by the CFI concerns one of five entities, leaving four additional entities for which **Stage 1** discovery has to be done so as to provide the court with sufficient information on which to rule whether they constitute community property, with expert witnesses in every stage of the process.  Id. at pp. 13-14.

UBS counters, based on information provided by Mr. Efrón and his attorney in the state proceeding (Attorney Méndez), that the inventory of assets is complete, and that Mr. Efrón has produced tens of thousands of pages in discovery (Docket No. 283 at p. 22).  It points out that in the first of two phases, it must be determined whether entities created during the marriage were initially capitalized with inherited or marital property; and that according to a 2008 Puerto Rico Court of Appeals opinion, "the Court of First Instance decided to bifurcate the proceedings 'to

resolve, first, whether the post-conjugal partnership had an economic interest in various entities created by Efrón during the marriage,'" and that this is "nearly complete." Id. at p. 23.

Further, UBS asserts that in 2008, the first entity, Karmiel Development, S.E., was held to have been capitalized with inherited property; that according to Mr. Efrón and Attorney Méndez the CFI has decided all but 5 of the roughly 23 disputed entities, each of which was found to have been capitalized with inherited property, like Karmiel; and that Mr. Efrón and his expert contend that the remaining 5 entities also were capitalized with inherited property.  Defendant notes that plaintiff has expressed a willingness to decide the remaining entities based on a single example, rather than individually, "which would . . . substantially reduce[] the time that the Court is obligated to hear evidence;" and that defendant agrees with this approach and would be prepared to do so in the present case.  Hence, it alleges that given the precedent set by Karmiel and other entities, "this could be done expeditiously." Id. at p. 23.

Moreover, it claims that the second phase would determine if each entity "increase[d] in value due to the effort of one of the members of the post marital community, or because it has produced benefits;" that Mr. Efrón contends "this phase can be decided quickly," as plaintiff undertook no efforts on behalf of the entities and, thus, the only issue is whether he was reasonably compensated for his efforts on behalf of each entity.  In UBS's view, if so, as Mr. Efrón contends, there are no retained profits that could be claimed as marital property.  Id.

UBS indicates that it would have no objection to the appointment of a special master to look into this issue, which in its view would streamline the Court's efforts; and that once these phases are complete, the CFI would move to the actual liquidation of the marital estate, as determined by the preceding phases, but that there would be no need for that phase in the case *sub-*

*judice*, since the only question is the value of Candelario's share of community property, and whether she has already been made whole.  Id.

The Court is not persuaded by UBS's argument.  Not only would such approach introduce in the present case elements that more properly correspond to the ongoing liquidation process in state court, but relies on time estimates that appear to contradict how the liquidation process has been organized and is being conducted in state court.[5]  Additionally, it seems to overlook the principles under which the evaluation that Mr. Efrón proposes must be carried through.

Pursuant to Article 1301 of the Civil Code, assets obtained by the industry, salary or work of the spouses or of either of them as well as the product, rent or interest received or accrued during the marriage, from the peculiar assets of each of the spouses is considered conjugal property.  P.R. Laws Ann. tit. 31 § 3641.  A spouse who owns separate property may dispose of such property freely, but the product obtained from such property through industry, through the ability and skill or artifice to do something, or through a value increase resulting from the efforts of the owner or spouse, shall always be conjugal.

As the Puerto Rico Supreme Court held in Alvarado v. Alemañy, 157 D.P.R. 672, 679 (2002) (citing Manresa, Comentarios al Código Civil Español, Volume IX, Sixth Ed., Reus, Madrid, 1969, p. 680), whether it is a day's pay or wages received periodically for manual work of more or less significance; whether it is from salaries or fees from the exercise of an office or profession; whether it is the produce of an industrial or commercial company, as compensation for work performed or services rendered; whether the work is industrial, agricultural, commercial,

---

[5] If UBS' estimate were realistic, it would not be unreasonable to assume that the liquidation process would have concluded in state court.  As previously as stated, it has not.

scientific, artistic or literary; and whether the profit is obtained by only one of the spouses or by both, belong to husband and the wife in equal parts.  See also, J. Puig Brutau, Fundamentos de derecho civil, Volume IV, 135 (2d Edition Bosch, Barcelona 1985) ("The capital gains or value increases experienced by assets because of the work or the activity of either of the spouses are community property because they consist in something that was obtained through work…")

In this model, the capital gains or value increases in private assets attributed to the work or the activity of either of the spouses are considered conjugal property because they consist of something that was obtained through work.  If the increase results merely from the passing of time, it only benefits the owner of the assets, whereas if it results from the effort of both or either of the spouses, it consists of community property.  R. Serrano-Geyls, Derecho de familia de Puerto Rico, Vol. I, 355-356, (San Juan, 1997).[6]

With this foundation, the Puerto Rico Court of Appeals examined Mr. Efrón's characterization of the same asset (Karmiel) to which UBS has referred, holding that:

> Karmiel is separate property . . . . But according to the rules and the doctrine that we have cited, the structures that the owner of the separate asset (Mr. Efrón) chooses to conduct his business cannot be used as a shield to prevent the product of the industry, that is, of the "skill or artifice", from being included in the liquidation of the conjugal partnership to exploit the separate assets and make them grow.  The earnings or product and increase in value of that separate asset that is the product of the effort of the spouse who owns the asset while married under the conjugal partnership regime cannot be encapsulated.  This is the principle that says that earnings are community property . . . . Because we are dealing with an interlocutory resolution that Karmiel consists in separate property, the matter of its evolutions by Efrón's ingenuity is subject to subsequent litigation.  In that second stage, Candelario is entitled to inquire into any evidence related to the administration and development of the lands transferred to Karmiel, ever since it was created until it, according

---

[6] Similarly, those elements are to be evaluated together with any post-conjugal increases in value.  Thus, in the event of an increase in the value of the post-marital community's assets derived from work by a former spouse, the increase must be divided according to the proportion that such work contributed to the increase.  In that case, the co-owner would be entitled to credit for work based on his share of the estate.  The interplay of these variables as noted in the text, ultimately lead to adjudication of the participant's share in the community property.  Montalván, 161 D.P.R. at 438.

to Efrón's testimony, "became inactive." That is the only way to find out whether there were profits or increases in its value and whether that is attributable to Efrón's ingenuity.

Efrón v. Candelario del Moral, 2008 WL 5941795, *12-13 (Puerto Rico Court of Appeals, October 29, 2008) (Docket No. 283, Exh. 9, pp. 12-13). Along the same line, the Court observed:

The manner in which one manages his business does not establish whether an asset acquired during a marriage consists in separate or community property. That is established by its origin. In this case, the business in question, according to the evidence considered, was a special partnership created by Efrón to transfer two properties belonging to Montecasino, which was a separate corporation that he inherited. The issue about how business are administered and developed and profits are generated and the value of the properties is increased, all of that is part of the evidence that Candelario can submit in the second stage of the litigation … The Civil Code and the scientific doctrine accompanying it recognize the serious difficulties this entails. The Code leaves the issue of clarifying whether there are added values or fruits in the separate assets and any excesses, concealments, intermingling and even fraudulent acts that may have been committed in the administration of the community or the separate property for a later time, when the conjugal assets are going to be liquidated.

Id. at *14. Likewise, the Court indicated:

The fruits of Efrón's work and the increase in value of his separate properties resulting from his efforts and ingenuity cannot be excluded from the inventory that must be made at the time of the liquidation of the community property. In the inventory, which is the initial phase of the liquidation process, a detailed list is made of the assets and rights and the obligations and burdens of the conjugal partnership at the time of the dissolution, accompanied by an appraisal thereof. The investments and the acquisitions made to the name of another individual or legal entity and considered community property and must be included in the inventory. The separate assets of each ex-spouse must be included in the inventory in order to know what possible transformations they may have suffered and what repercussions they may have on the community property and the determination thereof . . . . (Citations omitted.) … With regard to . . . . the business activity of Karmiel. . . .in the hands of [its] owner Efrón, the matter, as we already established, is subject to subsequent litigation …

Id. at *15, 17. Subsequent litigation is not litigation in the present case, but the ongoing liquidation process in state court.

UBS claims it would be "patently unfair" not to allow it to present the evidence by Mr. Efrón and his expert witness on Candelario's share of community property (Docket No. 292 at p. 11). But there is no unfairness, given the nature of the process that needs to be followed before determining what Candelario's (and Mr. Efrón's) ultimate share of the estate is. In that sense, the state liquidation process has been designed to evaluate all of the variables that must be considered in making that determination. By contrast, the present case focuses on the alleged breach of an obligation emanating from a writ of execution designed to secure *interim* (not final) relief.

Nevertheless, if what UBS means by unfairness is that unless it is allowed to introduce the evidence it wishes to present, plaintiff would otherwise be unjustly compensated, that would not be so. Such argument brings to the fore the doctrine of unjust enrichment as a possible bar to payment. To apply, however, that doctrine requires (1) payment to, or enrichment by one party; (2) corresponding loss, or impoverishment in the other party; and (3) absence of cause for the transfer of wealth from one party to the other. Ortiz-Andujar v. E.L.A., 122 D.P.R. 817, 824 (1988).

If Candelario were to prevail and be entitled to damages, there would be a correlative transfer of wealth (patrimonial displacement), from the defendant to the plaintiff. Yet the transfer would be predicated on cause. Enrichment is considered just – not unjust – when it results from a contractual obligation, from a title validly acquired by purchase or gift, or as a result of a legal or natural obligation. Id. Such would be the case here, as under the present scenario, defendant would be required to compensate Candelario on account of a legal obligation. Correspondingly, she would not be unjustly enriching herself at UBS's expense.[7]

---

[7] UBS' relationship with Mr. Efrón, who is not a party in this case, presents a different, unexamined dimension of this matter. From this standpoint, the Court observed in Docket No. 202 at p. 2, that "under the terms of Efron's master account agreement, UBS maintains that Efrón is obliged to indemnify UBS for any claims relating to his accounts, including for any settlements, judgments or damages incurred by UBS."

UBS suggests that trial should be bifurcated into an initial phase to deal with the negligence issue, and a second phase, if the Court ruled in plaintiff's favor on liability, where the share in community property can be addressed with the liquidation case presumably advancing further in the interim (Docket No. 283 at pp. 24-25).  The suggestion might have made more sense if the captioned case were not over six years old.  But it is.  As discussed, adjudication of Candelario's share in the community property is not appropriate in this litigation.  As the Puerto Rico Court of Appeals pointed out, "it was clearly stated in the (February 2006) Amended Judgment that the monthly amount of $50,000 was the 'amount Mrs. Candelario is entitled to receive on a monthly basis as her participation in the enjoyment of the community property.'  Until said community property is not liquidated, the respondent (Candelario) has such right."  Candelario del Moral v. Efrón, KLCE 2007 01405 (P.R. App. Nov. 28, 2007), Docket No. 38, Exh. 26 at p. 26.

That is the right – the right to *interim* relief – that the writ of execution sought to enforce, and which UBS allegedly violated.  So construed by Puerto Rico courts, the right extends through liquidation.  Id.; Docket No. 110, Exh. A, pp. 38-40 ("As long as there is no final and binding ruling to establish the exact amount of the conjugal mass, there is no reason to justify changing the monthly payments validated in numerous Judgments of panels of this Court;"…[I]f those payments exceed what [Candelario] is owed at the end of the other [the liquidation] suit, she will be obligated to reimburse that amount, obviously with interest").

From there, resolution of all doubts and controversies with respect to Candelario's share in the estate properly belongs to the liquidation proceeding in state court.  Whether she has received her due share of the community property will be ascertained by the CFI in that proceeding.  The

CFI's decision– once final and unreviewable – will put the issue to rest.  Until then, it is apparent that UBS' debt to Candelario remains.[8]

### 2.  Collateral

In January 2010, the Court held that UBS properly paid off a UBS Bank USA lien on Account JX-60059 before paying Candelario under the August 2007 Order.  See, Candelario del Moral v. UBS Financial Services Inc. of P.R., 691 F.Supp.2d 291, 304 (D.P.R. 2010), vacated, 699 F.3d 93 (1st Cir. 2012) ("The Court finds that insofar as Account JX-60059 was pledged as a Collateral Account for loan Account 5V50203, UBS acted correctly in paying off loan account 5V50203 with the funds from the former").  This particular holding was subsequently set aside by operation of the First Circuit's vacatur of the entire summary judgment ruling.  Upon further review, it must be modified, based on a two-tiered analysis.

### A.  One of the accounts subject to the October 2006 attachment order was validly pledged as collateral to a stateside entity, UBS Bank USA.

Candelario argues that UBS acted improperly in releasing funds to UBS Bank USA (Docket No. 291 at pp. 2-6).  A security interest in investment property may be perfected by control.  Both Utah law (Utah Code Ann. § 70A-9a-313(1)), which governed the Credit Line Agreement with Mr. Efrón, and the UCC, so permit.  To that end, in the case of investment property held through a securities intermediary (UBS), the secured party (UBS Bank USA) could perfect by control transferring securities to an account in its own name; becoming the entitlement holder;

---

[8] As of November 2012, Mr. Efrón owed Candelario in interim relief $5,473,627.98 plus legal interest.  Candelario del Moral v. Efrón, KLAN201300779 (P.R. App. November 22, 2013), Docket No. 250, Exh. 1, at pp. 3 and 13.  That amount "continues to increase monthly by $50,000 until the liquidation of the conjugal property and current communal property – plus – the legal interests of the debt."  Id. at 3.

<u>Candelario-Del Moral</u> v. <u>UBS</u>
Civil No. 08-1833 (PAD)
Opinion and Order
Page 15

arranging for the securities intermediary to act on instructions from the secured party to dispose of the positions, even though the debtor remains the entitlement holder.[9]

Puerto Rico has adopted the UCC articles applicable to investment property and secured transactions. <u>See</u>, Commercial Transactions Act, P.R. Laws Ann. tit. 19 §§ 401-2207, with relevant provisions similar to the Utah UCC. The Commercial Transactions Act provides that filing is not required to perfect "[a] security interest in investment property which is perfected without filing under § 2015 or § 2016 of this title," <u>Id.</u> § 2102(h). Instead, it recognizes that "[a] description of collateral in a security agreement or financing statement is sufficient to create or perfect a security interest in a [investment property]," <u>Id.</u> § 2015(3), and that "[a] security interest in investment property may be perfected by control," <u>Id.</u> § 2015(4)(a). Along the same line, it provides that control exists where the securities intermediary has agreed to comply with entitlement orders originated by the [secured party] purchaser without further consent by the entitlement holder. <u>Id.</u> § 1706(d)(2). These conditions appear to have been satisfied.

As to the priority to be accorded this interest, the Commercial Transactions Act accepts that "[a] security interest of a secured party who has control over investment property has priority over a security interest of a secured party who does not have control over the investment property,"

---

[9] <u>See</u>, Utah Code Ann. § 70A-9a-314 ("A security interest in investment property . . . may be perfected by control of the collateral under . . . Section 70A-9a-106."); § 70A-9a-106(1) ("A person has control of [investment property] as provided in Section 70A-8-105."); § 70A-8- 105(b) (a secured party "purchaser" has control where "the securities intermediary has agreed that it will comply with entitlement orders originated by the [secured party] purchaser without further consent by the entitlement holder"); § 70A-1a-201(2)(cc) & (dd) (defining "purchaser," as used in the UCC, to include a person who takes by "lien," "security interest," "or any other voluntary transaction creating an interest in property"); <u>see also</u> § 70A-9a-309(10) (automatic perfection of "a security interest in investment property created by a broker or securities intermediary").

Id. § 2015(5)(a).  In these circumstances, it is fair to conclude that UBS Bank USA had a perfected

security interest in Mr. Efrón's assets.

> B.  <u>UBS should not have deducted any funds from Account JX-60059 prior to
> liquidating the balance to comply with the CFI's order of August 2007</u>.

That a security interest has been perfected does not, however, necessarily mean it will be

acted on.  The Credit Agreement with Mr. Efrón provided that UBS Bank USA could "demand

full or partial payment of the Credit Line Obligations, in its sole and absolute discretion and

without cause, at any time."  (Docket No. 23, Exh. 1S, Section 10(b)).  In the event a collateral

account were attached or subject to a levy, the credit line obligation would immediately become

due and payable, such that the UBS Bank USA could, in its "sole and absolute discretion liquidate,

withdraw or sell all or any part of the collateral and apply the same ... to any amounts owed to the

Bank . . ." <u>Id.</u> at Section 10(a)(vii).

Apparently, this never happened.  According to Candelario, after the attachment order was

served on UBS in October 2006, all of Mr. Efrón's UBS investment accounts were frozen (Docket

No. 281 at p. 27).  But UBS Bank USA did not appear to have called due the line of credit or

liquidate assets for payment either during the initial freeze period, or during the months thereafter,

when it also could have called the amounts due.  <u>Id.</u> at pp. 27-28.

From this description, it seems Mr. Efrón withdrew some $2,600,000.00, in February 2007

and March 2007, while there remained unpaid amounts on the credit line.  Likewise, UBS allowed

Mr. Efrón access to the assets, despite the remaining balance on the credit line.  Over time, Mr.

Efrón paid off the credit line, which was reduced to zero by June of 2007.  After the entire credit

line was paid off in June 2007, however, he again borrowed against the active credit line, taking

additional credit pursuant to the Credit Agreement, in an amount exceeding $800,000.00.  Then,

in August, when UBS was served with the CFI's Order of Sale, it made the decision to pay $810,071.97 to UBS Bank USA. Id. at p. 28.

Candelario asserts that UBS has not produced any evidence demonstrating the Bank actually called the loan obligation due or demanded any payment. Id. at p. 29. As of February 2007, there were over $11,000,000.00 in Mr. Efrón's UBS accounts. Without evidence that UBS Bank USA demanded payments (and when and under what terms it did so), that is the amount from which UBS's compliance with the October 2006 attachment order is to be measured.

**3. Applicable interest.**

UBS claims that imposition of 10.5% interest rate would be imposing upon it prejudgment interest prohibited by Puerto Rico law (Docket No. 283 at pp. 16-17). In general, Puerto Rico law allows pre-judgment interest only where the court finds that the party has acted with obstinacy. See, Rule 44.3(b) of the Puerto Rico Rules of Civil Procedure, P.R. Laws Ann. tit. 32, App. V, R. 44.3(b); In re Redondo Constr. Corp., 700 F.3d 39, 43 (1st Cir. 2012).

A finding of obstinacy requires that the court determine a litigant to have been unreasonably adamant or stubbornly litigious, beyond the acceptable demands of the litigation, thereby wasting time and causing the court and the other litigants unnecessary expense and delay. Id. at 43. A party is not obstinate when she simply litigates a novel question of law. Elba A.B.M. v. U.P.R., 125 D.P.R. 294, 330 (1990). Since liability in the case *sub judice* would be predicated upon an issue of first impression, UBS argues, it cannot be held to have been obstinate, and for that reason, pre-judgment interest would be inappropriate (Docket No. 283 at p. 17).

Interest emanating from a writ or order of execution is not considered prejudgment interest, but interest built into a judgment that the creditor seeks to enforce. See, Padilla v. Vidal, 71 D.P.R.

517, 527-528 (1950)(legal interest is part of the judgment, even if judgment does not mention it). As such, it is component of the obligation to which UBS was subject when it released Mr. Efrón's accounts.

Courts have been entrusted with power and authority to enforce their judgments and to adopt appropriate and effective executive process for their enforcement.  Along the same line, a party to an action in whose favor a money judgment is entered is entitled to seek enforcement of that judgment.  In Puerto Rico, this is accomplished through a writ or order of execution.  The writ includes principal, costs and interest, which are part of the judgment.  See, José Cuevas Segarra, IV Tratado de Derecho Procesal Civil, 1437 (2d Ed.) (". . .[T]ambién puede obtenderse un mandamiento de ejecución respecto a la suma concedida para … intereses, porque forman parte de la sentencia"); II P.P.P. Procedimiento Civil, 280 (Análisis Editorial, 1988) (same).

The 10.5 % interest included in the October 2006 writ of execution was imposed by a court (CFI) order as modified the Puerto Rico Court of Appeals' Amended Judgment of February 2006. On this formulation, it is not prejudgment interest but an element of the obligation that UBS allegedly breached.

UBS claims the 10.50% interest-accrual period does not extend beyond September 2007 because the most that UBS would have been required to pay Candelario that month, was the outstanding balance of the Attachment Order plus accrued interest as of that date (Docket No. 283 at p. 18).  For UBS, this is an ascertainable sum, and additional interest claims against it must be analyzed according to the pre-judgment principles discussed above.  Id.

The CFI's August 2007 Order required it to liquidate Mr. Efrón's accounts to pay Candelario $4,160,512.61 and to keep the accounts frozen until interest could be determined as of

the day of payment. UBS only paid Candelario $351,783.13. If it had not released Efrón's accounts, it would have been able to pay the amount the Order provided for. A significant part of the $4,160,512.61 remains unpaid. That part is subject to the interest component of the obligation, which will continue to accumulate until satisfied.

If Candelario prevails at trial, post-judgment interest would be at the federal rate. 28 U.S.C. § 1961; Cummings v. Standard Register Co., 265 F.3d 56, 68 (1st Cir. 2001). Candelario argued that any such interest accrues as of the entry of the now-vacated judgment in January 2010. When a judgment is vacated on appeal, post-judgment interest accrues from the date judgment is entered on remand. Therasense, Inc. v. Becton, Dickinson and Company, 745 F.3d 513, 518 (Fed. Cir. 2014).

In this instance, the First Circuit vacated the prior judgment as to both liability and damages, and remanded the case for further discovery and a trial. Candelario, 699 F.3d at 106-07. Thus, post-judgment interest would accrue from the date of a future judgment. That interest would apply to all components of the obligation covered by the judgment, including the 10.50% interest fixed by state court. Quesinberry v. Life Ins. Co. of North America, 987 F.2d 1017, 1029 (4th Cir. 1993).

**4. UBS may deduct from any damage award (a) $215,000.00 that Candelario received from Mr. Efrón between June 2001 and August 2002; (b) $200,000.00 that Candelario received from Mr. Efrón between November 2006 and January 2007; and (c) $587,640.00 ($608,827.00 less fees) that Candelario recovered from Mr. Efrón's accounts in Banco Santander in 2009 and 2010.**

Candelario has conceded the propriety of deducting the $215,000.00 received in 2001-2002, and the interest reflected on this amount in the Attachment Order (Docket No. 281 at n. 1

and Docket No. 283 at p. 9).  Nevertheless, she challenges the propriety of deducting the remaining amounts.

First, she contends that because the $200,000.00 were paid after issuance of the October 2006 order of attachment "there is absolutely no basis in fact or legal authority for UBS to assert that these subsequent payments, corresponding to months subsequent to the Order of Attachment, should be used to reduce obligations for failing to comply with the … [O]rder …" (Docket No. 281 at p. 20).  UBS asserts that these amounts corresponded to periods included in the Attachment Order and as such, should be properly credited against Candelario's damages claim (Docket No. 283 at p. 11).  Further, it states that under Article 1127 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 3177, payments on interest-bearing obligations must first be applied to interest, then to the principal, and where an obligation carries the same nature and charges, any payments shall be applied to all pro rata.  Id.  By the same logic, it argues that the November 2006-January 2007 payments would first be applied to interest – both the interest due under the Attachment Order and the additional interest that would have accrued as of the date of each payment.  Id.  A perusal of the record persuades the Court that these payments are linked to periods covered by the Attachment Order, and as such, should be deducted from the award.

Second, UBS asserts that the money Candelario attached in Banco Santander was transferred from UBS, and given the fungibility of money, it should be deducted from any amount UBS were required to pay (Docket No. 283 at pp. 12-14; Docket No. 292 at pp. 5-6).  Candelario replies that UBS' proposition would require litigants to identify money trails provoking inordinate delays while ultimately shedding no light on the issue of defendants' liability (Docket No. 281 at 21).

At the end of the day, the recovery of Efrón's assets from Banco Santander corresponds to Candelario's obligation to mitigate damages. It does not matter the money was transferred from UBS. The mitigation doctrine requires the injured party to take advantage of reasonable opportunities to minimize her damages and avoid or prevent a loss. Conjugal Partnership Jones-Jones v. Conjugal Partnership Pineda-Pineda, 22 F.3d 391, 398-400 (1st Cir. 1994); Fresh-O-Baking v. Molinos de P.R., 103 D.P.R. 509, 520 (1974).

In those circumstances, money recovered contributes to make a plaintiff whole for the damages sought. To prevent excess recovery, they are offset from the damages award even if obtained from a third party like Banco Santander. This formulation underlies deduction of a plaintiff's post-termination earnings from back-pay awards in case of illegal employment termination. See, Hernández-Badillo v. Municipio de Aguadilla, 154 D.P.R. 199, 209 (2001)(deduction of earnings plaintiff received after dismissal in violation of Puerto Rico law); Selosse v. Fund. Educ. Ana G. Méndez, 122 D.P.R. 534, 552-553 (1988)(deduction in context of breach of employment contract under Civil Code). The same principle applies with equal force in this case.

## III.   CONCLUSION

With this backdrop:

1. Should UBS be found liable to Candelario, in the absence of evidence that UBS USA Bank exercised its right to call in Mr. Efrón's credit line, damages are to be assessed against the approximately $11,000,000.00 deposited in Mr. Efrón's accounts with UBS as of February 2007, when it released Mr. Efrón's accounts.

2. The September 2007 Order required UBS to pay Candelario $4,160,512.61 and to keep

Mr. Efrón's accounts frozen until payment of interest could be determined for unpaid amounts and until otherwise the court ordered.  UBS paid Candelario $351,783.13. Correspondingly, it owes Candelario $3,808,739.48 ($4,160,512.61 - $351,783.13).

3.  From that sum, UBS may deduct $1,002,640, reflecting the $215,000.00 that Candelario received from Mr. Efrón in 2001-2002, the $200,000.00 that she received from Mr. Efrón in 2006-2007, and the $587,640.00 (net of fees) that she recovered from Mr. Efrón's accounts in Banco Santander.

4.  The 10.50% interest rate is a component of the obligation to be satisfied.  It is not to be calculated on the $215,000.00 and $200,000.00 to be deducted, but applies to the $587,640.00 recovered from Banco Santander until the date(s) of the corresponding attachments. From entry of judgment in this case, the unpaid amount (plus 10.50% interest) would be subject to the federal interest rate until fully paid.

**SO ORDERED**.

In San Juan, Puerto Rico, this 14th day of November, 2014.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge