## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MADELEINE CANDELARIO DEL MORAL,<br><br>    **Plaintiff,**<br><br>        **v.**<br><br>UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO,<br><br>    **Defendant.** | **CIVIL NO.  08-1833 (PAD)** |

## OPINION AND ORDER

Delgado-Hernández, District Judge.

Madeleine Candelario initiated this action against UBS Financial Services in 2008 under Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5141, claiming that UBS negligently released some $12 Million from accounts controlled by Candelario's former husband, David Efrón.  These assets had been restrained pursuant to an order issued by the Court of First Instance of Puerto Rico ("CFI") to satisfy Efrón's unpaid obligations to Candelario.  The obligations originated in the division of community property resulting from their divorce in 2001.

After UBS removed the restraints, approximately $11 Million were eventually removed from the accounts, such that when the CFI finally ordered the assets liquidated to pay Candelario, $1.1 Million remained.  From those $1.1 Million, UBS paid a loan of about $800,000.00 that Efrón had obtained from UBS Bank USA in the State of Utah, and provided Candelario a check for $351,000.00. Pursuant to 28 U.S.C § 1332, Candelario has sued to collect the difference here.[1]

---

[1] Before today, the case generated seven published opinions describing and discussing different aspects of the litigation in federal court. By chronological order, these are: Candelario del Moral v. UBS Financial Services Inc. of Puerto Rico, 691 F.Supp.2d 291 (D.P.R. 2010)("Candelario I"); Candelario del Moral v. UBS Financial Services Inc. of Puerto Rico, 703 F.Supp.2d 79, 83 (D.P.R. 2010)("Candelario II"); Candelario del Moral v. UBS Financial Services Inc. of Puerto Rico, 815 F.Supp.2d 495, 508 (D.P.R. 2011)("Candelario III"); Candelario del Moral v. UBS Financial Services Inc. of Puerto Rico, 699 F.3d 93 (1st Cir. 2012)("Candelario IV"); Candelario del Moral v. UBS Financial Services Inc. of Puerto Rico, 290 F.R.D. 336 (D.P.R.

In 2010, the court (Casellas, J.) granted Candelario's motion for summary judgment, concluding that UBS was negligent in releasing the accounts based on an oral order included in an uncertified copy of a minute of proceeding that had not been notified to the parties, and which even lacked the judge's signature.  Judge Casellas concluded that Efrón was liable to Candelario for $3,808,739.48.  Candelario I, 691 F.Supp.2d at 291.  The First Circuit reversed, holding that although UBS acted on the basis of a facially invalid minute, summary judgment principles required a trial.  Accordingly, it remanded the case to determine if UBS acted reasonably under Article 1802 by relying on the minute when it released the accounts to Efrón.  Candelario IV, 699 F.3d at 95, 105-106.

The case was tried before the undersigned between December 4, 2014 and December 12, 2014 (Docket Nos. 330, 333, 335, 338, 341, 342, 345).[2]  As part of her case in chief, Candelario presented forty-six (46) exhibits, and the testimony of six (6) witnesses, Candelario herself, Guillermo Bobonis, Luz Nereida Colón, Carmen Szendrey, Francisco García, and Carlos A. Cabán-García.  UBS, in turn, presented 178 exhibits and the testimony of five (5) witnesses, Andrea Wolff, Lorena Kern, Michelle Pirallo, German Brau and Candelario in its case in chief. Both sides submitted post-trial briefs on February 28, 2015 (Docket Nos. 355 and 357).  Having had the opportunity to observe and hear all of the witnesses, assess their credibility, examine and evaluate the exhibits, review the 1,880-page long trial transcript, and carefully study the parties' arguments, the court finds by a preponderance of the evidence that:

- UBS was negligent: its decision to release the accounts to Efrón unreasonably overlooked the risk of loss to Candelario.

---

2013)("Candelario V"); In Re Efrón, 746 F.3d 30 (1st Cir. 2014)("Candelario VI"); and Candelario del Moral v. UBS Financial Services Inc. of Puerto Rico, 81 F.Supp.3d 143, 146-147 (D.P.R. 2014)("Candelario VII").

[2] Plaintiff did not request trial by jury.

- UBS' negligence caused damages to Candelario: as of today, those damages amount to $4,725,629.00.

- Candelario was not negligent and no downward adjustment is required in the amount that UBS must pay her.

- Candelario's action is not time-barred.

- Even though UBS was negligent, it was not obstinate or vexatious to the point of justifying an award of attorney's fees and prejudgment interest against it.

To facilitate review, the material has been organized under the following topics:

| | | | |
|---|---|---|---|
| I. | BASIC FACTUAL BACKGROUND……………………………..… | | 4 |
| II. | PROCEDURAL DEVELOPMENTS………………………….…. | | 6 |
| | A. | Initial Filings……………………………………………..... | 6 |
| | B. | Post-Judgment Reaction…………………………………… | 7 |
| | C. | New Motion……………………………………………..… | 7 |
| | D. | First Circuit……………………………………………….... | 9 |
| III. | FACTUAL FINDINGS AND LEGAL CONCLUSIONS………..… | | 10 |
| | A. | Liability…………………………………………….…... | 10 |
| | | 1. | UBS: Relevant Organizational Aspects…………..…. | 10 |
| | | 2. | Parallel Litigation: Candelario and Efrón………….... | 12 |
| | | 3. | Oral Order……………………………………….…... | 14 |
| | | 4. | Decision to Release Restraints………………….…... | 16 |
| | | 5. | Implementation of Decision……………………….…. | 17 |
| | | 6. | Lack of Disclosure……………………………….…... | 17 |
| | | 7. | Prelude to Mandamus and Sales Order……..………… | 19 |
| | | 8. | New Judge……………………………………….…..... | 20 |
| | | 9. | Order of Sale……………………………………….…... | 20 |
| | | 10. | Shortfall……………………………………….…..... | 21 |
| | | 11. | Efrón's Accounts…………………………………….…… | 22 |

Candelario Del Moral v. UBS
Civil No. 08-1833 (PAD)
Opinion and Order
Page 4

|       |    | 12.  | Negligence……………………………………….....  | 24 |
|       |    |      | i.    | Basic Analysis…………………………………  | 24 |
|       |    |      | ii.   | Luz Nereida Colón……………………………  | 28 |
|       |    |      | iii.  | Guillermo Bobonis …………………………  | 30 |
|       |    |      | iv.   | German Brau ……………………………  | 33 |
|       |    |      | v.    | Lorena Kern…………………………………  | 40 |
|       |    |      | vi.   | Miscellaneous……………………..………  | 42 |
|       | B. | Damages………………………………………………  | 43 |
|       |    | 1.   | Obligation…………………………………  | 43 |
|       |    | 2.   | Assets……………………………………  | 43 |
|       |    | 3.   | Adjustments, Principal and Interest…………………  | 48 |
|       | C. | Comparative Negligence………………………….……  | 49 |
|       | D. | Statute of Limitations……..………………………  | 55 |
|       | E. | Attorney's Fees………………………………..……....  | 59 |
|       |    | 1.   | Candelario's Perspective……………………….....  | 60 |
|       |    | 2.   | UBS' Perspective……………………………  | 64 |
|       |    | 3.   | Assessment…………………………………  | 67 |
| IV.   |    | CONCLUSION……………………………………………..  | 69 |

## I.    BASIC FACTUAL BACKGROUND[3]

In 1983, Candelario and Efrón were married, and constituted a legal conjugal partnership. In May 2001, the marriage ended in divorce. The same month, the CFI ordered Efrón to pay Candelario a monthly payment of $50,000.00 as part of her participation in the assets of their partnership.

In March 2005, the CFI decreased the monthly payment to $20,000.00. In January 2006, the Puerto Rico Court of Appeals increased to $50,000.00 the monthly amount to be paid by

---

[3] The basic factual background is taken from Candelario VII, 81 F.Supp.3d at 146-147.

Efrón.  In February 2006, it issued an Amended Judgment to provide that legal interest on this obligation would be retroactive to June 4, 2001.

In October 2006, the CFI issued an Order and Writ of Execution providing, among other things, for the attachment of Efrón's real and personal property.  Third parties were to retain the property and to remit to the CFI funds sufficient to satisfy the principal sum of $4,160,522.61 with interest at the rate of 10.50% *per annum* from June 4, 2001.  The same month, UBS was served with the Order and attached Efrón's accounts.

In February 2007, UBS released the accounts, which at that time had assets worth over $12,000,000.00.  Then Efrón started making withdrawals.  By July 2007 the value of the accounts had decreased to $1,155,367.71.  In August 2007 the CFI issued an Order for the Sale of Assets, requiring UBS to sell and liquidate Efrón's assets in the accounts until the amount of $4,160,512.61 was reached; to issue a check payable to Candelario for that amount; and to maintain Efrón's accounts frozen until the amount of interest accrued on the debt as of the payment date was calculated and the CFI ordered otherwise.

In September 2007, UBS liquidated the securities; wired $810,071.87 to UBS Bank USA to pay a loan that entity had made to Efrón; and paid Candelario the remaining $351,783.13.  Candelario claims UBS was negligent in releasing the accounts in February 2007 in violation of the October 2006 attachment order, and seeks payment of $3,808,739.48[4], plus interest over that sum at the rate of 10.50% retroactive to June 2001, costs and attorney's fees.

---

[4] That is, $4,160,512.61 - $351,783.13.

## II.   PROCEDURAL DEVELOPMENTS

### A.  Initial Filings

On August 8, 2008, Candelario initiated the action alleging that UBS failed to conserve and negligently released Efrón's assets in February 2007 - despite the CFI's October 2006 attachment order.  Candelario I, 691 F.Supp.2d at 292.  She posits that as a result of UBS's actions, Efrón depleted the accounts, preventing her from receiving $3,808,739.48 in addition to interest. Id.

On April 3, 2009, UBS moved for summary judgment, arguing that Candelario's claims (1) are time-barred, (2) lack merit because the October 2006 Order had been orally vacated by a CFI Judge, Charles Jiménez-Nettleship, during a hearing held on November 13, 2006; and (3) that the restraints on the accounts were removed after review of the order, the minutes of the hearing where the order was issued, Candelario's unsuccessful appeals to the Puerto Rico Court of Appeals and Supreme Court, and the rulings of those courts.  Id.

On May 6, 2009, Candelario filed a cross motion for summary judgment, pointing out that the November 2006 oral order did not affect the validity of the October 2006 attachment order, because the minutes in which the order appears were never signed by the CFI Judge or certified and notified to the parties as required by Rule 32(b)(1) of the Rules for Administration of the Court of First Instance of Puerto Rico, P.R. Laws Ann. tit. 4 Ap. II-B, R. 32(b)(1).  Candelario I, 691 F.Supp.2d at 292-293. In consequence, she argued, the oral order was not valid or enforceable.  Id. at p. 293.  The parties filed numerous replies and sur-replies.  Id.

On October 20, 2009, the court requested that the Puerto Rico Supreme Court certify whether an order included in a minute of proceeding lacking the judge's signature was valid; on November 13, 2009, the Supreme Court declined Certification, and on January 13, 2010, the court

entered summary judgment finding UBS negligent and liable to Candelario for $3,808,739.48.  Id. at 303-304.

### B.  Post-Judgment Reaction

UBS appealed the decision (Docket No. 90).  In turn, Candelario moved for reconsideration as to the damages award, alleging that the judgment should be amended to order that UBS deposit all sums in Efrón's accounts as of February 2007; in her view, the purpose of the writ of execution had been to provide her with an alternate source of funds to collect Efrón's unpaid obligations (Docket No. 93).  On April 9, 2010, the court denied Candelario's motion, noting that the October 2006 Order ". . . did not impose any additional obligation upon UBS aside from the attachment of certain properties in an amount sufficient to [pay]… $4,160.522.61 plus interest, that is, the amount already partially paid to Plaintiff by UBS and the remaining amount awarded in [the court's] January 2019 Judgment."  Candelario II, 703 F.Supp.2d at 83.

### C.  New Motion

On June 4, 2010, three weeks before the due date for its appellate brief, UBS moved to set aside the damages award under Rule 60(b) of the Federal Rules of Civil Procedure (Docket No. 110).  To that end, it alleged that a 2010 decision of the Puerto Rico Court of Appeals revealed that Candelario had received payments from Efrón, which contradicted her position in this forum, that the decision constituted newly discovered evidence, evinced fraud, misrepresentations, or misconduct by Candelario, and raised the possibility that the judgment here may had been satisfied. Id.  For UBS, that situation made prospective application of the judgment no longer equitable, and justified relief from the judgment itself.  Id.  Candelario opposed the motion (Docket No. 112).

In response, the court stated that it was inclined to grant UBS' motion partially, expressing interest in receiving evidence showing that Candelario "may have received funds from Efrón since

2001 satisfying the amounts owed in this suit" (Docket No. 115 at p. 3).  Because the CFI had scheduled an evidentiary hearing, however, the court held in abeyance UBS's motion, ordering the parties to keep it informed about the state court proceedings.  Id. at p. 4.

The CFI delayed eight months in holding the evidentiary hearing, finally holding the hearing on March 4, 2011 (Docket No. 157, Exh. A). But before the CFI could enter judgment, Efrón filed a bankruptcy petition staying the proceedings (Docket No. 137).  In the meantime, UBS requested that this court reopen the discovery process to allow new interrogatories, a document request, a deposition of Candelario, and a subpoena to and a deposition of Efrón (Docket No. 121), all of which the court denied, finding that ordering discovery was a waste of resources, especially considering that the issue of payments, if any, made by Efrón to Candelario was before the CFI (Docket No. 136 at p. 2).

Along the same line, UBS pressed for a hearing on damages, whereas Candelario maintained that the judgment entitling her to payments from Efrón remained unpaid (Docket Nos. 138-142, 157, 161, 163-165).  The court heard the parties at an in-chambers conference (Docket No. 159), concluded that additional delay of a decision on UBS's Rule 60(b) motion was unnecessary, and denied the motion.  Candelario III, 815 F.Supp. at 508.  In that regard, it noted that contrary to what UBS had represented, the evidence supporting UBS's motion was not new, that UBS had had access to hearing transcripts and to the minutes which contained the so-called evidence that UBS characterized as new, and that UBS could blame no one but itself for failing to address the "new" evidence before the entry of judgment.  Id. at 504-505.

Similarly, the court stated that UBS had over seven (7) months of discovery to corroborate Candelario's version of the facts, but there was no record evidence that it did so.  Id. at 505.  The court described UBS's requests as "nothing more than an ill-advised attempt to sidestep the effects

of a failed litigation strategy," Id. at 506, stating that UBS had failed to provide the court with clear and convincing evidence about the alleged misconduct.  Id. at 507.  Having denied the motion, however, the court nevertheless amended the judgment to reflect that the $4,160,522.61 awarded, already included the interest accumulated before October 6, 2006, the date in which the order of attachment was issued.  Id. at 508.

### D.  **First Circuit**

The First Circuit vacated the judgment because, approaching the record from a UBS-friendly vantage under Rule 56 of the Federal Rules of Civil Procedure, it found that more than one inference concerning the reasonableness of UBS' conduct could be gleaned from the facts. Candelario IV, 699 F.3d at 104-106.  In that sense, it held that UBS had a duty to determine whether the minute releasing the attachment was facially valid under Puerto Rico law, and was presumed to know what a facially valid order looks like.  Moreover, it held that the minute here was facially defective because no judge signed it, and that UBS made a mistake in deeming the minute valid. Id. at 104.  So holding, it posed the question of whether UBS had acted reasonably.  Id.

The First Circuit identified a number of factors that could lead a trier of fact to conclude that UBS acted reasonably, including: (1) the absence of any Puerto Rico case holding unsigned minutes are facially defective; (2) that UBS's outside counsel reviewed the minutes before UBS released the accounts; (3) Candelario's failed to raise the signature issue either in her communiqués with UBS or in her motion to reconsider with the Puerto Rico Supreme Court; and (4) UBS's compliance manual, which "plausibly suggests that something short of signed minutes may suffice."  Id. at 105.

At the same time, the First Circuit recognized a number of factors allowing a different inference, pointing out that: (1) UBS' lawyers should have advised UBS that Rule 32(b) requires

the judge's signature, but did not do so; (2) UBS could have asked the judge to clarify any doubts concerning the impact of the minutes (something it had no trouble doing, as shown by an earlier motion to clarify the first attachment order), but did not do so; and (3) UBS could have taken other legal steps to protect itself such as filing an interpleader action, but once again, UBS did not do so. Thus, the court remanded the case for trial, stating that the mere fact that UBS had its lawyers look the minutes over before unfreezing Efrón's accounts was insufficient to show that it acted reasonably; that UBS had the duty to review the documents for their "substantive content;" and that, on remand, this court consider what steps UBS took in the process, beyond having its attorney review the documents.  Id. at 106-107.

### III.    FACTUAL FINDINGS AND LEGAL CONCLUSIONS[5]

### A.  Liability

The evaluation of whether UBS is liable to Candelario requires an initial examination of UBS' organization, of the judicial dispute between Candelario and Efrón, and of how the dynamics of that dispute impacted the interaction between UBS and Candelario to produce the outcome challenged here.

### 1. UBS: Relevant Organizational Aspects[6]

UBS is a financial services firm with branches throughout the United States and Puerto Rico.  Tr. VI at p. 32:6-11.  It has a Legal Department in Weehawken, New Jersey with approximately 50 attorneys. Tr. III at pp. 111:1-112:6; Tr. VI at p. 49:20-22. Puerto Rico is

---

[5] The factual setting for the discussion of the different legal issues that the parties have raised will be part of the same section, with facts preceding the discussion as appropriate.

[6] In this Opinion, "Tr." citations refer to the trial transcripts and are followed by the volume number; "PX" citations refer to Candelario's Exhibits; and "DX" citations refer to UBS' Exhibits.  Copies of the trial transcripts can be found at the following dockets: Trial Tr. vol. I at Docket No. 337; Trial Tr. vol. II at Docket No. 340; Trial Tr. vol. III at Docket No. 344; Trial Tr. vol. IV at Docket No. 347; Trial Tr. vol. V at Docket No. 348; Trial Tr. vol. VI at Docket No. 350; and Trial Tr. vol. VII at Docket No. 352).

considered both a region and a division.  Tr. VI at 32:24-25.  Each division has at least one in-house "Division Counsel" who works out of Weehawken and is responsible for overseeing legal matters in the division.  The Division Counsel's job for Puerto Rico was shared by two UBS employees operating out of New Jersey, Francine Hoyt and Andrea Wolff.  Tr. VI at pp. 36:23-37:11; Tr. VI at 38:23-25; 98:18-24.  There was also a General Counsel for Puerto Rico, Héctor Becil, who supervised Hoyt and Wolff.  Tr. VI at pp. 98:25-99:13.

UBS has a Legal Processing and Control Group, also referred to as the Subpoena, Levy and Garnishment Group ("SLG Group").  Tr. III at p. 112:21-23.  The group is responsible for processing and responding to the various types of restraints that the Firm receives, including complying with court-ordered garnishment of client assets.  Tr. III at pp. 112:25-113:8; PX 1 at p. 2.  The SLG group has the authority to make decisions regarding the proper handling of court documents.  Tr. VI at p. 89:6-13.  It has an attorney at the head of the group.  Tr. III at p. 113:9-10; Tr. VI at p. 48:11-25.

UBS's branch offices must forward to the SLG Group, by mail or fax, all matters related to restraints.  The SLG Group reviews court documents and decides on the appropriate response.  In cases involving attachments, when court documents are in Spanish, the practice at UBS was for local Division Control employees to send the documents to the SLG group with a summary setting forth what was being required of UBS.  UBS Financial Services Compliance Bulletin, No. 06-15 (September 21, 2006), provides that once a legal restraint is placed on an account, it can only be "released upon receipt of a court order or other instructions from the court." PX 1 at p. 4.

For many years, UBS in Puerto Rico has used the services of Mr. Guillermo Bobonis as outside counsel.  When Division Counsel had questions about legal matters concerning Puerto Rico, they would speak to Mr. Bobonis and in some instances, involve General Counsel Becil.  Tr.

VI at pp. 101:19-102:7.  After consulting with outside counsel, Division Counsel would assess the issue and discuss it amount themselves internally to assure that they were all on the same page. Tr. VI at pp. 102:13-19; 166:14-167:1.  Mr. Bobonis gave his opinion; the New Jersey-based attorneys would discuss it internally among themselves to insure that they were all on the same page.

In Puerto Rico, UBS has branches and a Division Control Office.  The Office is in charge of handling court orders, subpoenas, levies and garnishments jointly with the legal department.  In 2006-2007, the head of the Office was Luz Nereida Colón.  She served as the legal liaison between the business side and the legal department; and was charged with understanding risk exposure across the Division in Puerto Rico.  Tr. III at pp. 106:8-23.   In situations in which there were threats of lawsuits against the firm by competing sides in controversy, Ms. Colón would consult with Division Counsel.

### 2.   Parallel Litigation: Candelario and Efrón

Candelario and Efrón were married from 1983 to 2001.  <u>Candelario VII</u>, 81 F.Supp.3d at 146. As part of their final divorce decree, the CFI ordered Efrón to pay Candelario $50,000.00 monthly, plus interest on any unpaid amounts at the rate of 10.5%.  <u>Id.</u>  On February 16, 2006, the Court of Appeals of Puerto Rico held that the obligation would be retroactive to June 4, 2001, the date the divorce decree became final.  <u>Id.</u>  By September 2006, Efrón had made only one payment to Candelario.  <u>Id.</u> at 148.

On October 9, 2006, Judge Jiménez Nettleship of the CFI issued an attachment order providing for the attachment of Efrón's assets (Docket No. 300 at pp. 87-88, "Stipulations Regarding Facts and Documents," Stipulation No. 12); <u>see also</u>, PX 14.  The Order was to execute the February 16, 2006 Judgment of the Court of Appeals.  The Marshal was to attach Efrón's assets

and to proceed "if necessary, to the sale thereof until" the amount of $4,160,522.61, plus 10.5%

interest on all unpaid amounts, was reached.

On October 20, 2006, a Marshal served the attachment order on UBS (Docket No. 300 at

p. 88, Stipulation No. 14).  That day, Elie Marie Berríos, Associate Division Control Officer in

San Juan, faxed the documents to the SLG Group in Weehawken.  PX 11.  Consistent with the

regular practice at UBS with respect to Puerto Rico, Ms. Berríos included in her fax a brief

explanation of what the Spanish-language documents meant and what was being required of UBS.

Tr. VI at pp. 84:15-85:2; PX 11.

Ms. Berríos explained that "if any position is found under [Mr. Efrón's name], the monies

must be consigned [sic] in the court."  PX 11, UBS bates-stamp no. 428.  In an email later that

day, Ms. Berríos wrote, "[l]et's make sure to freeze all the accounts."  PX 11, UBS bates-stamp

no. 430.  By 5:20 p.m. on October 20, 2006, the accounts had been frozen, as confirmed in an

email sent by SLG Group employee Irma Veitch, to Ms. Berríos.  DX 10.  At that time, there were

close to $12 Million in Efrón's accounts.  Tr. VI at pp. 23:21-24:5; see also, Section III(A)(11)

below.

On October 20, 2006, Ms. Berríos sent the documents by fax to Mr. Bobonis.  PX 12.  That

same day, Mr. Bobonis had a phone conversation with Efrón's attorney.  After speaking with

Efrón's attorney, he contacted the CFI, and spoke directly with Judge Jiménez Nettleship, who

confirmed that the attachment order was still in effect.  Then Ms. Colón stated in a memo dated

October 26 that UBS would "execut[e] the sale of positions and consign[] the amount of

$4,160,522.61 [. . .] to comply with the court order."  PX 13.

On October 27, 2006, Mr. Bobonis spoke with UBS Regional Manager Eugenio Belaval,

who requested that Mr. Bobonis file a motion in court seeking clarification, rather than proceeding

to liquidate the accounts.  Mr. Bobonis prepared and filed a Motion to Clarify, mentioning certain ambiguities in the attachment order, including whether the 4.16 Million dollar amount included interest; and that UBS should not be held liable for any losses incurred by virtue of the sale of the assets.  According to Ms. Colón, UBS had decided to file the motion because "the client [Efrón] and the FA [broker] are hysterical with this garnishment" and both sides in the Candelario/Efrón litigation "were threatening us."  PX 16.  Efrón had also called UBS Puerto Rico CEO Miguel Ferrer and told him that only liquid funds could be consigned.

On October 20, 2006, SLG Group employee Irma Veitch notified officials of the UBS USA Bank, with whom Efrón had a credit line, that in compliance with the court order, it had to shut down the line owed to that entity.  PX 16; DX 177, UBS bates-stamp no. 1163.  Craig Darvin, an Associate General Counsel in Weehawken, with responsibility for the operations of the UBS USA Bank, asked Ms. Veitch for details of the attachment.  In response, Ms. Veitch told him that the monies had to be deposited in court, through outside counsel, and that she was awaiting further communication from Mr. Bobonis.  PX 16; DX 177, UBS bates-stamp nos. 1161 and 1162. Division Counsel Francine Hoyt and Andrea Wolff were copied on these emails.

### 3.  Oral Order

Efrón asked the CFI to reconsider the attachment order.  A hearing was held on November 13, 2006, during which Judge Jiménez Nettleship orally ruled that he was setting aside the orders and attachment annotations.  The next day, Mr. Bobonis wrote to Division Counsel Francine Hoyt and Andrea Wolff, as well as to the Division Control employees in Puerto Rico, Ms. Colón and Elie M. Berríos, to inform them that "the judge decided to set aside the order to attach assets of David Efrón," and that UBS could "expect to receive a written order in the near future."  DX 178, UBS bates-stamp no. 1058.

On or about November 16, 2006, Candelario presented a Motion in Aid of Jurisdiction and Petition for Mandamus in the Puerto Rico Court of Appeals, requesting the Court to stay the oral order, and to require the CFI to comply with its ministerial duty to order execution of the February 2006 Judgment (Docket No. 300 at p. 95, Stipulations Nos. 30 and 31).  On November 21, 2006, the Court of Appeals denied Candelario's petition for lack of jurisdiction, stating that the oral ruling "does not appear in a signed minute or notified order."  It was, according to the Court of Appeals "something … still before the [CFI], under its consideration and pending a written decision." Id., UBS bates-stamp no. 65.  In its Opinion, the Court of Appeals quoted the text of Rule 32(b)(1), which reads in part:

> The minutes will constitute the official record of the most important incidents that occur at the hearing in court and in chambers, and will be prepared as prescribed by the rules established by the Administrative Director of the Courts and certified by the Clerk of Court Services.
>
> The original minutes will be included in the court record.….
>
> The minutes will not be notified to the parties or to counsel, unless they include a Resolution or an Order issued by the judge in open court, in which case, [they] will be signed by the judge and notified to the parties.

On or about December 15, 2006, Candelario filed a petition for *certiorari* with the Puerto Rico Supreme Court challenging the Court of Appeals' decision (Docket No. 300 at p. 91, Stipulation No. 35).  She argued that Mandamus was a proper remedy, because she had an undisputed right to the execution of the final Judgment and the CFI had refused to comply with its ministerial duty to execute the prior mandate.  On February 15, 2007, the Puerto Rico Supreme Court denied the petition because the record lacked "the necessary documents reflecting what was ruled in the oral hearing ... on November 13, 2006."  The Order was officially notified to the parties on February 16, 2007.  Tr. III at p. 204:15-18.

### 4.   **Decision to Release Restraints**.

On February 14, 2007, Efrón provided UBS with 23 pages of documents, in Spanish, consisting of Candelario's Petition for mandamus in the Court of Appeals; the November 21, 2006 Court's Judgment denying the Mandamus; and a "Minute" of the November 13, 2006 hearing before the CFI.  Tr. III at pp. 153:21-154:3.  Ms. Colón received the documents, and made a preliminary decision to release restraints on Efrón accounts.  Tr. III at pp.173:20-174:5.  The minute she reviewed is not certified for authenticity, does not bear the signature of the CFI judge; and contains no indication that it was officially notified to the parties.

On February 15, 2007, Ms. Colón sent the 23 pages with a cover page by fax to Mr. Bobonis, PX 18; Tr. III at p. 163:10-24, who told Ms. Colón that he agreed with her decision.  Tr. III at p. 178:25-179:7.  The same day, Ellie Berríos sent a fax to the SLG Group requesting the release of the restraints.  She included the same pages which Efrón had delivered to UBS. Characterizing the documents as "a Court Order and other documentation," she asked SLG to "remove the restriction from the account."  DX 32.

Moreover, in the fax, Ms. Berríos provided the following summary of the 24 pages:

> It is stated in the documentation that the orders and the notations regarding the embargo were left without effect.  They would continue with the procedures regarding the disposition of the payment in this case.  Mr. Efrón is not released from the payment of the monthly payment and will need to pay immediately $250,000.00 as confirmed by the Supreme Court.  Id.

Contrary to what the summary stated, the Supreme Court had not confirmed a judicial ruling.  Rather, it had denied on jurisdictional grounds the petition for *certiorari* that Candelario filed.  Considering the interlocutory character of the order, the Court could have asserted jurisdiction thereafter.

### 5.   Implementation of Decision

In the morning of February 16, 2007, Ms. Berríos informed SLB that Efrón was requesting $50,000.00 from his account,  PX 24, UBS bates-stamp no. 572, and that the request for release of the restraints had been made the previous day.  Id.  At 9:45 a.m. she asked SLG to inform her when the restraint would be removed.  PX 24, UBS bates-stamp no. 569.  One half hour later, she wrote an urgent email to an SLG paralegal, stating "PLEASE CALL ME.  I NEED YOU!!."  Id. Shortly before noon, she was "on the line with legal processing" to find out how much Efrón needed that day.  PX 24, UBS bates-stamp no. 579.

Later that morning, Ms. Colón informed attorney Andrea Wolff that the "Court Order" and other documentation had been sent to SLG the previous day and that Division Control had requested the restraints to be removed.  PX 24, UBS bates-stamp nos. 572-573.  In her email to attorney Wolff, she provided the same summary which Ms. Berríos had sent to SLG the previous day, mentioning the "court order" and "other documentation."

Ms. Wolff was confused by the email.  She asked Ms. Colón what was being requested of her.  "You lost me.  Not sure what this means or if you need something from us."  PX 24, UBS bates-stamp no. 584.  Ms. Colón responded by saying it was just "FYI" ("For your Information").  The restraints were removed on that day (Docket No. 300 at p. 96, Stipulation No. 38); see also, PX 24, UBS bates-stamp no. 577.

### 6.   Lack of Disclosure

On February 5, 2007, a hearing was held in a related case between Candelario and Efrón.  During that hearing, Efrón's attorney made reference to a "minute" of the November 13, 2006 hearing.  Ms. Michelle Pirallo, Candelario's attorney, asked Efrón's attorney for a copy of the minute, but Efrón's attorney never provided it.  Ms. Pirallo sent a law clerk to the CFI to obtain a

copy of the minute, but the clerk was turned away and could not get access to the file.  Ms. Pirallo

then went to the court herself, but was told that she did not appear as counsel of record.

On February 9, 2007, Ms. Pirallo sent a letter to Mr. Bobonis, which he received on

February 21, 2007, requesting that UBS maintain the assets frozen.  She informed Mr.  Bobonis

that the "verbal order" issued by Judge Jiménez Nettleship was not final and binding ("final y

firme"), that Judge Jiménez Nettleship had never issued a written order vacating the attachment,

and that no Resolution had been issued.  PX 25, UBS bates-stamp 98; DX 44.  On February 21,

2007, Mr. Bobonis responded to this letter, indicating that he had the opportunity to read the minute

and the judgment (sentencia) of the Court of Appeals; and that he did not understand what the

Supreme Court had to do with the enforcement (ejecución) of a judgment that presumably already

was final and binding.  PX 25, UBS bates-stamp no. 495 (Spanish version) and UBS No. 90

(English version).  He did not inform Ms. Pirallo that UBS had released the restraints some five

days earlier.  Id.

On February 27, 2007, Mr. Bobonis sent to Ms. Pirallo, vía fax, an unofficial copy of the

minute that Efrón had provided to UBS.  PX 24, UBS bates-stamp no. 100.  Two days later, on

March 1, 2007, Ms. Pirallo sent to Mr. Bobonis a copy of a Motion for Reconsideration which she

had filed with the Supreme Court; the motion included the minutes Bobonis had sent her.  PX 25,

UBS bates-stamp 413.  She asked Mr. Bobonis to assure her that UBS would maintain the restraints

on the accounts, noting that the CFI never notified the minute of the November 13, 2006 hearing

and that for that reason the revocation of the attachment order was not final and unreviewable.  Id.

Again, Mr. Bobonis did not inform Ms. Pirallo that UBS had released the restraints.  Ms. Colón

spoke with Mr. Bobonis, and on March 6, 2007, wrote a memorandum to Carlos Ubiñas (President

of UBS in Puerto Rico), informing him that apparently Ms. Pirallo had sent the motion to Mr. Bobonis with the intent to have UBS place restrictions on Efrón's account again.  PX 27.

On March 2, 2007, Ms. Pirallo filed an urgent motion with the CFI, requesting formal notification of the minutes (Docket No. 300 at p. 97, Stipulation No. 42); see also, PX 28.  She mentioned that she obtained a copy of the minutes from a third party, UBS, on February 27th; and describes her unsuccessful attempts to obtain the minutes from the court file.  On March 29, 2007, she wrote to Mr. Bobonis, informing him that she had seen the minutes in the court file, that the minutes had not been notified to the parties, and that the oral ruling was not final or enforceable. She informed Mr. Bobonis that she had requested formal notification of the minute.  PX 25, UBS bates-stamp no. 497.  Finally, she informed Mr. Bobonis that her client would hold UBS responsible for any alienation of the assets if the Efrón accounts did not remain frozen until there was a final and unappealable resolution overturning the (October 2006) attachment order.  Id.  Mr. Bobonis wrote back to Ms. Pirallo on April 2, 2007, acknowledging receipt of the March 29th letter, but once again did not inform Ms. Pirallo that the restraints had been released.  PX 24, UBS bates-stamp no. 504.

### 7.   Prelude to Mandamus and Sales Order

On April 20, 2007, Ms. Pirallo filed a second urgent motion requesting the CFI to notify the minutes (Docket No. 300 at p. 97, Stipulation No. 45); see also, PX 28.  She mentioned that Mr. Bobonis had "implied" that the attached assets would be released, and that if the firm [UBS] did this, Efrón would be able to alienate the assets.  DX 47.  On May 9, 2007, Ms. Pirallo filed a motion indicating that the minute was "not signed", and that Judge Jiménez Nettleship had no authority to revoke verbally an attachment in execution of a final judgment by a court of higher authority.  Ms. Pirallo asked the CFI to "comply with the Mandate of September 8, 2006" (relating

to the February 16, 2006 Court of Appeals Judgment), order execution of the judgment, and order

UBS to sell all assets and to pay Candelario the sum of $4,625,434.43 (Docket No. 300 at p. 97,

Stipulation No. 46); see also, PX 31, UBS bates-stamp 850; DX 51.

### 8.  New Judge

By June 2007, a new judge, Arlene Sellés Guerini had been assigned to the Candelario/Efrón

divorce case.  On June 18, 2007, she took note of the pending motions.  Rather than ruling on the

motions (which included the May 9th motion), however, she issued an order, which reads as follows:

> [r]egarding the rest of the motions, the Court rules that since we
> were assigned to this courtroom at the beginning of the year, we will
> proceed to study the case file and listen to the hearing on November
> 13, 2006.  Once we are in position, we will issue the corresponding
> resolution and/or order and if necessary, **a hearing will be
> scheduled.**
>
> See, PX 34, UBS bates-stamp no. 871 (Spanish) (emphasis in the
> original) and DX 53, bates-stamp nos. 1138-1139 (English
> translation).

On June 20, 2007, Ms. Pirallo presented a second Mandamus Petition in the Court of

Appeals arguing that the June 18 order by Judge Sellés did not comply with the "final and binding"

judgment of February 16, 2006.  PX 34, UBS bates-stamp nos. 870-872.  On July 19, 2007, the

Court of Appeals granted the mandamus, ordering Judge Sellés to issue the necessary orders or

resolutions to execute the mandate issued after the February 16 judgment of the Court of Appeals.

To assure prompt action on the mandamus, the mandate in this second mandamus case was to issue

immediately, "without any delays." PX 34, UBS bates-stamp no. 877.

### 9.  Order of Sale

On July 23, 2007, Ms. Pirallo sent a copy of the mandamus decision to Mr. Bobonis, asking

him to "confirm that UBS has maintained David Efrón's funds frozen, since there never has been

any order which was notified, vacating the execution of the February 16, 2006 Judgment of the

Court of Appeals."  PX 35.  There is no evidence that Mr. Bobonis ever answered Ms. Pirallo's

letter.  Nonetheless, he sent the letter, along with the Second Mandamus Petition and the Judgment

of the Court of Appeals issuing the Mandamus, to Ms. Colón, advising her that the Court of

Appeals Judgment was entered in the court file on July 20, 2007.  PX 36, UBS bates-stamp 866.

On August 6, 2007, Ms. Pirallo filed another motion with the CFI, requesting that Judge

Sellés order UBS to sell the assets immediately and to make the amount of $4,160,522.61 available

to the plaintiff, and to order UBS to freeze the Efrón accounts until the balance due and the interest

on that balance, as well as amounts due on the ongoing obligation, were calculated. PX 37, UBS

bates-stamp nos. 894-896.  She sent a copy of this motion to Mr. Bobonis, who in turn, forwarded

it to Ms. Colón.  PX 37, UBS bates-stamp no. 893.

On August 20, 2007, Judge Sellés ordered that all assets, up to the sum of $4,160,522.61

be sold, relieving UBS of responsibility for any loss incurred.  Once the assets were sold, UBS

was to issue a check in that amount to Madeleine Candelario.  Finally, the Judge ordered that UBS

"maintain all of David Efrón's accounts frozen" until the interest on the debt could be calculated,

or the court ordered otherwise.  PX 39, UBS bates-stamp nos. 776-778; see also, Docket No. 300

at p. 92, Stipulation No. 47.  At the time of this order, neither Candelario nor her attorney had been

informed that the restraints had been released some six months before.

### 10. Shortfall

The Order of Sale was served on UBS on Monday, August 27, 2007.  See, PX 42, e-mail

of August 27th, UBS bates-stamp nos. 1137-1138; see also, Docket No. 300 at p. 98, Stipulation

No. 48.  On Friday, August 31st, the credit line was paid off.  Id.; see also, PX 42, UBS bates-

stamp no. 930.  The payment was for $810,071.87, corresponding to a debt which Efrón incurred

in early June 2007, after he had already paid off the credit line debt which he owed at the time of

the attachment eight months earlier. Id.; see also, UBS bates-stamp no. 931.  Thus, there were

$351,783.13 left for Candelario.   Id.; see also, UBS bates-stamp nos. 1143 and 1150 (e-mail

approving the payment at 2:32 p.m.).  On Tuesday, September 4, 2007, UBS issued a check

payable to Candelario in the amount of $351,783.13.  Candelario's attorney picked up the check

in person (Docket No. 300 at p. 97, Stipulation No. 55).

### 11. Efrón's Accounts

During the relevant time frame, Efrón had three accounts in UBS: (1) an Investment

Account (JX60059), (2) a REPO Account (WR 00855), and (3) a Credit Line (5V-50203) with

UBS Bank USA.[7]  The Investment Account (JX-60059) was pledged as collateral for the Credit

Line (Account 5V-50203).  The following chart reflects the worth of Efrón's assets in UBS during

the period critical to the assessment of UBS' obligation toward Candelario.

| Date (as of month's end) | Investment Account (in $) | Credit Line Pledged to UBS Bank (in $) | Net (in $):[8] |
|---|---|---|---|
| September 2006 | 11,451,937.04 | - 7,489,474.66 | 3,962,462.38 |
| October 2006 | 11,430,478.81 | - 7,486,974.11 | 3,943,504.70 |
| November 2006 | 11,516,093.80 | - 7,529,331.67 | 3,986,762.13 |
| December 2006 | 11,546,429.21 | - 7,584,481.14 | 3,961,948.07 |
| January 2007 | 11,653,329.55 | - 7,613,550.50 | 4,039,779.05 |
| February 2007 | 11,472,680.48 | - 7,478,981.35 | 3,993,699.13 |

---

[7] As described during trial, the REPO Account was a repurchase account, pursuant to which a client or seller agrees to sell to a buyer or another client, with the condition to buy back at a specific price, including interest (Docket No. 347 at pp. 207-208).  The term "credit line" was characterized as a loan from UBS Bank USA, a bank affiliated to UBS, which lends money to UBS' clients using the client's UBS brokerage accounts as collateral for the loans.  Tr. VI at p. 53:5-16.

[8] The chart does not reflect the value of securities in the REPO Account, which had a value, net of margin debt, of between $600,000 and $714, 246 for the period of October 2006 through February 2007.  The investments in the collateral account were pledged with the debit balance in the lending account. Tr. IV at p. 215:7-12.

| March 2007 | 8,875,671.91 | - 7,517,198.76 | 1,358,473.15 |
| April 2007 | 4,435,536.55 | - 3,064,640.21 | 1,370,896.34 |
| May 2007 | 4,435,769.00 | - 2,974,867.88 | 1,460,901.12 |
| June 2007 | 1,213,763.91 | - 829,327.59 | 384,436.32 |
| July 2007 | 1,155,276.71 | - 804,043.16 | 351,233.55 |
| August 2007 | 351,783.13 | - 1,370.36 | 350,412.77 |
| September 2007 | 630.32 | - 0.00 | 630.32 |
| October 2007 | 631.67 | - 0.00 | 631.67 |
| November 2007 | 632.33 | - 0.00 | 632.33 |
| December 2007 | 632.91 | - 0.00 | 632.91 |

These figures account for the following transactions:

- February 16, 2007: Withdrawal of $50,000.00.  PX 5, UBS bates-stamp no. 327.

- February 20, 2007: Transfer of $177,578.00 to Credit Line. PX 5, UBS bates-stamp nos. 253, 327.

- March 13, 2007: Withdrawal of $300,000. PX 5, UBS bates-stamp no. 333.

- March 19, 2007: Wiring out of $1,850,000.000. Id.

- March 28, 2007: Wiring out of $425,000. PX 5, UBS bates-stamp no. 334.

- April 20, 2007: Transfer of $4,493,447.00 from Investment Account to Credit Line. PX 5, UBS bates-stamp nos. 258, 341.

- May 14, 2007: Assets in REPO Account transferred out of UBS (value net of margin debt of between $600,000.00 and $714,246.00. DX 10, UBS bates-stamp no. 429; Docket No. 357 at p. 119.

- May 23, 2007: Transfer of $53,275.23 from Investment Account to Credit Line. PX 5, UBS bates-stamp nos. 260, 348.

- May 25, 2007: Transfer of $53,276.00 from Investment Account to Credit Line. PX 5, UBS bates-stamp nos. 260, 348.

- June 1, 2007: Transfer of $2,980,335.91 from Investment Account to Credit Line (PX 5, UBS bates-stamp nos. 262, 355), liquidating obligation to UBS Bank USA.

- June 5, 2007: Withdrawal of $112,960.00 from Investment account. PX 5, UBS bates-stamp no. 355.

- June 8, 2007: Borrowed $827,228.00 against Credit Line. PX 5, UBS bates-stamp no. 262.

**12. Negligence**

    i.    **Basic Analysis**[9]

Under Article 1802 of the Puerto Rico Civil Code, "[a] person who by an act or omission causes damage to another through fault or negligence" may be held liable for the damage.  P.R. Laws Ann. tit. 31 § 5141; Calderón-Ortega v. United States, 753 F.3d 250, 252 (1st Cir. 2014). Negligence includes the failure to exercise due diligence to prevent foreseeable harm.  Malavé-Félix v. Volvo Car Corp., 946 F.2d 967, 971 (1st Cir. 1991); Wojciechowicz v. United States, 576 F.Supp.2d 241, 272 (D.P.R. 2008), aff'd 582 F.3d 57, 71 (1st Cir. 2009); Candelario II, 699 F.3d at 99.  UBS did not act reasonably to prevent foreseeable harm to Candelario.  It had a multi-level structure with attorneys and outside counsel for consultation.  But the process within that structure generated a mistaken outcome, unreasonably overlooking signs of harm.

Luz Nereida Colón made the decision to release the restraints after receiving the 23 pages Efrón sent to UBS on February 14, 2007.  Those pages included the November 2006 decision of the Court of Appeals in response to Candelario's first mandamus petition, and the unsigned minute of the proceeding where the oral order was issued.  The Court of Appeals' decision made specific

---

[9] Because this is a diversity case, Puerto Rico substantive law controls.  Alejandro-Ortiz v. P.R. Elec. Power Auth., 756 F.3d 23, 26-27 (1st Cir. 2014).

reference to Rule 32(b), which expressly requires a judge's signature in minutes with resolutions or orders, which must be notified to the parties.  Further, it stated that the order was not in a signed minute or a notified order, and that the matter was under the consideration of the CFI, pending a written decision ("dictamen escrito").  It is apparent that no judge signed the minute that Efrón gave UBS, and that the package Ms. Colón reviewed did not include a written decision by a judge.

After Ms. Colón made the decision to release those restraints, the remaining back-up control systems at UBS failed to review those materials carefully.  Division Control employee Ellie Marie Berríos sent the documents to the SLG Group, along with the "summary" which was used to describe the Spanish-language documents.  SLG had decisional authority as to the appropriate response to subpoenas, levies or garnishments, and if there were issues or questions it could raise them to its manager or to regional or outside counsel.  Tr. VI at p. 89:1-13.  But it did not question what Ms. Berríos described as a "Court Order."  Even if personnel in SLG could not read Spanish, they could have easily ascertained that the document purporting to be a "Court Order" was not signed by a judge, nor was it a written decision by a judge.

The final control mechanism within UBS' organization would have been Regional Counsel in Weehawken.  Puerto Rico had the benefit of two Regional Attorneys, Andrea Wolff and Francine Hoyt, as well as General Counsel, Héctor Becil.  However, they were not consulted.  On February 15, 2007, Ms. Colón informed Division Counsel Andrea Wolff that the "Court Order" and other documentation had been sent to SLG the previous day, and that Division Control had requested that the restraints be removed.  In her email to attorney Wolff, Ms. Colón provided the same summary which Ms. Berríos had sent to SLG the previous day, mentioning the "Court Order" and "other documentation."  Ms. Wolff was confused by the email, asking Ms. Colón what was being requested of her.  "You lost me.  Not sure what this means or if you need something from

us." Ms. Colón responded by saying it was just "FYI" ("For your Information").  Even so, during trial Ms. Wolff testified that she did not have an issue with releasing the restraints on February 16th, because the email so informing her stated that it had been discussed with Mr. Bobonis.  Tr. VI at pp. 71:21-72:1.  As UBS has pointed out, "there is no evidence to suggest that Wolff would have done anything differently" (Docket No. 357 at p. 92).  Thus, the Legal Department did not conduct an independent review of the matter.

Candelario's attorney informed Mr. Bobonis by letter dated February 9, 2007, that Judge Jiménez-Nettleship never issued a written resolution vacating the attachment order, that his resolution had not been notified and therefore, that it was not final and binding.[10]  In Sánchez v. Hosp. Dr. Pila, 158 D.P.R. 255 (2002), the Puerto Rico Supreme Court held that the period to petition for certiorari of an interlocutory oral order by the CFI given in open court in a civil case begins to run when the parties are notified with copy of the minutes in the manner provided for by Rule 32(b).  In Martínez v. Martínez, 2005 WL 1379372, *2-3, *8-9 (P.R. Court of Appeals April 22, 2005), the Puerto Rico Court of Appeals held that minutes must be notified by the CFI to all parties to activate the period to seek review of an interlocutory order issued during a pretrial conference.  In Cruz González v. Thermo King de Puerto Rico, Inc., 2006 WL 4073763, *1-2 (P.R. Court of Appeals December 20, 2006), the Puerto Rico Court of Appeals held that only officially notified signed minutes constitute an officially reviewable judicial decision (dictamen oficial revisable).  Similarly, the period to seek review in the Court of Appeals begins to run when the CFI notifies the minute signed by a judge.  Id. at *2; Díaz-Carrasquillo v. Soto Ortiz, 2012 WL 1912294, *2 (P.R. Court of Appeals March 30, 2012).

---

[10] The First Circuit focused on the signature element in finding the minutes facially defective.  See, Candelario IV, 699 F.3d at 102 n.6.  To evaluate whether the mistaken reliance on those facially defective minutes was reasonable, however, examination of UBS' treatment of the notice requirement is appropriate in light of the arguments that UBS has raised.

Candelario's attorney's assertion that Judge Jiménez Nettleship had not issued a written resolution was correct.  Based on the cases cited in the preceding paragraph, her representation that, without notice, the issue was not beyond review was accurate.[11]  Even though by Mr. Bobonis' account he received the February 9th letter on February 21, 2007, when UBS still had sufficient assets to cover Efrón's indebtedness to Candelario, UBS could have restricted the accounts anew. Yet there was no internal review to assess whether Ms. Pirallo's representations realistically put UBS at risk and, thus, on whether UBS should reconsider its initial decision to remove the restraints on Efrón's accounts.[12]

Nevertheless, UBS argues that the decision it made to release Efrón's account was reasonable, stating that it is undisputed that the CFI orally set aside the attachment order and denied Candelario's oral motion for reconsideration of that ruling; Candelario and Efrón treated the oral order as immediately effective, Candelario by filing the first mandamus petition and Efrón by paying her $200,000 pursuant to the oral order; and that UBS awaited written confirmation of the order, sought and relied on Mr. Bobonis' advice, and followed what it describes as the custom and practice of local practitioners and of the financial services industry (Docket No. 357 at pp. 8,10, 67-74, 90).  Critical to its theory are the testimonies of Ms. Colón and Mr. Bobonis, and of its expert witnesses, Judge German Brau and Ms. Lorena Kerns.  The court now focuses on those testimonies.

---

[11] Mr.Bobonis testified that the term "final y firme" (final and binding) does not apply to oral interlocutory orders, only to judgments.  Tr. III, at p. 189-190.  But the term is also used to describe an order open to review.

[12] UBS could have filed a motion with the CFI to clarify this matter.  The cost of doing so would have been minimal – probably less than one hour of Mr. Bobonis' time (billed at $175 per hour, PX 45, UBS bates-stamp 618) – compared to the significant potential liability it faced if found to have improperly released the restraints (in excess of $4.1 Million), while protecting it from liability to Efrón.

ii.      **Luz Nereida Colón**

Ms. Colón testified that she made a preliminary decision right away to release the restraints after reviewing the documents that Efrón provided to UBS on February 14, 2007.  Tr. III at pp. 153:21-154:3; 173:20-174:5; 176:18-25.  She said that her decision was based on the unsigned minute and the other documents received at that time, and that even though her practice was to review all documents, she could not recall having read through each of the documents that UBS received on February 14th.  Tr. III at p. 178:9-15.  She could not say one way or the other, and could not recall having considered the Supreme Court's resolution in making the initial determination that the restraints should be released, but said that she may have considered it.  Tr. III at p. 205:4-15.

Ms. Colón recognized that UBS had a duty to determine whether the minutes releasing an attachment were facially valid under Puerto Rico law.  Tr. IV at pp. 37:20-38:1.  However, she could not recall having read the November 2006 Court of Appeals' opinion, though she stated that she probably did.  Tr. IV at pp. 39:24-40:5.  That opinion includes the text of Rule 32(b)(1).  Ms. Colón asserted that she probably noticed the reference to Rule 32(b)(1) in the opinion, although she could not say for sure.  Tr. IV at p. 40:22-25.  She could not remember if she read the part of the rule stating that minutes must be signed if they contain an order, and could not say one way or the other if she checked the minute to see if it was signed by the judge. Tr. IV at p. 41:9-42:8; Tr. IV at p. 50:10-21.  Similarly, she could not recall if she saw or read the part of the opinion stating that the matter was still under the consideration of the CFI, awaiting a written order.  Tr. IV at 44:11-46:3; 50:10-21.

Ms. Colón asserted that she started working with UBS in 2000; since then has processed hundreds of orders attaching or releasing accounts.  Tr. III at p. 231:6-16.  She did not specify if

any of those orders - other than the one here - was included in unsigned minutes.   She

acknowledged UBS' policy of not removing restraints on accounts except upon receipt of a court

order or other instructions from a court.   She could not recall if UBS was mentioned in the minute.

Tr. IV at p. 68:10-25.   When shown the minute during trial, she said it contained instructions to

UBS even though the minute does not mention UBS.   Tr. IV at p. 70:10-73:3.

Ms. Colón pointed out that her responsibilities included risk assessment.   Tr. IV at pp.

77:19-24; 78:14-16.   She said that those assessments are "embedded" in what she and everyone

does in UBS, stated that for every decision she needed to consider different possible consequences,

but asserted that it was not something to be done or conducted in connection with every matter.

Tr. III at pp. 139:19-140:11; Tr. IV at pp. 86:8-15; 97:22-98:5.   She could not remember having

considered or discussed the possibility that it might be prudent for UBS to file a motion clarifying

what its obligations were here, because for her, the copy of the minute reflected an oral order on

what UBS needed to do.   And she could not recall having considered whether Mr. Bobonis should

call the court to confirm what to do, but did not think she considered it.   She did not know whether

the SLG Group or Division Counsel conducted a risk assessment.   Tr. IV at pp. 88:15-21; 90:16-

21; 91:4-10; 96:1-7.   The risk assessment she conducted here was to consult with Mr. Bobonis.

Id. at pp. 98:1-99:25.

At another level, Ms. Colón asserted in a response to interrogatories as UBS representative

in this litigation, that Candelario had exhausted all of her appeals.   She said that exhaustion meant

there was no other recourse to obtain a different judgment.   Tr. III at p. 204:3-5.   She did not

remember whether she considered the Supreme Court's resolution denying review when she made

the initial determination that restraints should be released.   Tr. III at p. 205:11-15.   She could not

recall the conversation she had with Mr. Bobonis, whether he said that Candelario had exhausted

appeals, or what documents were reviewed at that time.  Tr. III at p. 199: 5-15; Tr. III at p. 237:21-23.[13]  At that point, UBS' counsel was aware that Candelario's attorney had not been officially notified with copy of the minutes.  As discussed earlier, without official notice the term to seek appellate review had not begun.

Based on Ms. Colón's testimony and demeanor, the court concludes that she only read the unofficial copy of the facially defective minute, without concentrating her attention on (1) the content of the Court of Appeals' opinion in the first mandamus petition, (2) the text of Rule 32(b)(2) included in the opinion, or (3) the Court of Appeals' observation that the oral order was not contained in a signed minute or notified order, and that the matter was under the consideration of the CFI, awaiting a written decision (dictamen).  Simply stated, the documents were not reviewed for their substantive content.[14]

### iii.    Guillermo Bobonis

Mr. Bobonis has represented UBS in numerous legal proceedings, including arbitrations and lawsuits in local and federal court, and in matters involving the Office of the Commissioner of Financial Institutions of Puerto Rico, the New York Stock Exchange, the National Association of Securities Dealers, and the Financial Industry Regulatory Authority.  Tr. I at pp. 122:1-17-123:1.  He testified that Rule 32(b) is "dead letter," and that attorneys with whom he has spoken have commented that to him.  Tr. II at pp. 140:19-141:9; 141:23-142:1.  It is unclear how many

---

[13] Mr. Bobonis could not say exactly what he told Ms. Colón but stated that he probably took her through the different appellate steps that Candelario had taken, probably mentioning something to the effect that she had exhausted appeals.  Tr. I at p. 207:6-12. He testified to have reminded her that garnishment had been set aside, and that the Court of Appeals and the Supreme Court had refused to review.  Tr. II at p. 200:2-9.

[14] Mr. Bobonis acknowledged that he did not discuss with Ms. Colón the Court of Appeals' opinion or the requirements of Rule 32(b).  Tr. II at p. 41:18-42:1.  Moreover, the unsigned minute mentions the attachment order, and payments owed to Candelario, stating that payments had to be made immediately. DX 25, UBS bates-stamp no. 45.  It is silent on whether setting aside the attachment order was immediate.  The distinction was not reviewed for significance in light of the other materials that Efrón provided to UBS in February 2007.

attorneys he has spoken to about this issue (he did not say), or when or in what context those conversations occurred.[15]

Even minimizing the hearsay-related trustworthiness limitations that his assertion entails, it lacks the hallmarks of persuasiveness typical of well-conducted surveys.  As such, it does not have probative force.  See, Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc., 19 F.3d 125, 134 (3d Cir. 1993)(noting that the probative value of a survey is a highly fact-specific determination); Leonard Leonar Studio Equipment, Inc. v. Desmar Corp., 173 F.3d 435, *4 (Fed.Cir. October 13, 1998)(according little weight to survey due to methodological flaws, including poor survey design, biased response coding, and lack of a statistical reliability level); First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1383 (9th Cir. 1986)(rejecting survey in part because it biased respondents).

Mr. Bobonis said that he has examined minutes that are not signed by judges and are not notified to the parties, and that such is the "general rule."  Tr. II at pp. 139:5-19, 159:11-22.  As this case shows, those cases do exist.  That does not mean, however, that those requirements are being systematically ignored to the point of making the rule "dead letter."  The requirement of a judge's signature only applies where the minutes contain an order or resolution issued in open court, and no study or survey was submitted suggesting, much less confirming Mr. Bobonis' view that neither judicial officers nor court personnel are complying with the requirements of Rule 32(b)(2) and were not complying with them as of February 2007.

In the same way, Mr. Bobonis' characterization is inconsistent with the report he provided to UBS on November 22, 2006, after being informed that Judge Jiménez Nettleship had orally set

---

[15] According to the Puerto Rico Supreme Court's Registry of Attorneys ("Registro Uniforme de Abogados") – of which the court takes judicial notice under Rule 201 of the Federal Rules of Evidence – as of December 2006 there were 10,524 attorneys admitted to practice in Puerto Rico; as of December 2007, there were 10,986; and as of December 2015 there were 14,885.

aside the attachment order.  At that time, he advised UBS that it should expect a written order in the near future.  The Puerto Rico Court of Appeals' opinion of November 2006 quotes Rule 32(b); its text specifies that minutes with an order issued in open court must be signed by the judge and notified to the parties.  Moreover, it expressly states that the matter was under the consideration of the CFI, awaiting a written decision ("dictamen").  Unsigned minutes are not a decision in writing by a judge.  Judge Jiménez Nettleship never issued any such decision.

Mr. Bobonis thought that the statements in the Court of Appeal's opinion, particularly the Court's observation that the matter was still before the CFI awaiting a written decision, were wrong.  Tr. I at p. 220:10-14; Tr. II at p. 89: 10-16.  He testified that what the Court of Appeals stated had nothing to do with practice in local courts.  Tr. I at pp. 220:24-221:1.  From his perspective, regardless of what the Court of Appeals stated, the minute was valid.  Id.  The court is not persuaded by Mr. Bobonis' testimony.  It was the Court of Appeals' opinion what mattered here, for it judicially framed the issues to be considered, including that which remained to be done in the CFI: a signed minute, notified to the parties, or a written decision ("dictamen").[16]  No signed minute existed, no signed minute had been notified, and no written decision had been issued by Judge Jiménez Nettleship or any judge in the CFI before UBS decided to lift the restraints on Efrón's accounts in February 2007.  As the First Circuit observed, "the judge's signature requirement is not a picayune thing to be brushed aside whenever it pleases."  Candelario IV, 699 F.3d at 102.

---

[16] Mr. Bobonis had informed UBS as much in November 2006, when he wrote to UBS that they should expect a written order in the future.  Parenthetically, Efrón's attorney submitted a draft resolution to be signed by the CFI. Tr. I at p. 199:1-13.  There is no evidence that any judge ever signed that or any other draft to vacate the attachment order.

    iv.       **German Brau**

Judge Brau testified as an expert witness for UBS.[17]  He was a Superior Court (CFI) judge from 1988 until 1992, DX 95 at p. 10:13-26, and a judge in the Puerto Rico Court of Appeals from 1992 to 2009.  DX 95 at p. 25:1-20.  As an appellate judge he sat by designation in the CFI in cases of some complexity about once a year.  DX 95 at p. 28:5-13.  From 2009 to 2013 he was in private practice. DX 95 at p. 36:6-14.  In private practice he was never involved in a case where the issue of signing of minutes was decisive.  DX 95 at p. 45:17-46:10.

As for his own experience in the CFI, Judge Brau testified that each judge has about 1,000 active cases in the docket, with some 100 new cases assigned every month.  DX 95 at p. 12:13-17. Minutes were brought to his attention several times a month; he could have 50 minutes or so to read and approve every week.  DX 95 at p. 18:1-7.  Because approval of the minutes did not really solve cases or move cases along, approval of minutes was not a priority for him.  DX 95 at pp. 18:22-19:26.  He stated that after he read the minutes, he would not have time to sign them and would tell the secretary to place the minutes in the official file.  DX 95 at p. 20:4-11.

Why that was so is unclear, as reading a minute consumes more time than signing it, and in that sense, represents a marginal – almost *a de minimis* fraction of the time devoted to reading the document.  Judge Brau said that placing the minute in the official file was the equivalent of signing it.  DX 95 at p. 20:16-23.  Nevertheless, he acknowledged that is not how Rule 32(b) reads. DX 95 at pp. 219:23-220:9.  It would have been easy for the Puerto Rico Supreme Court, which adopted the rule, to state in Rule 32(b) or in another rule that placing a minute in the court file was the equivalent of signing it but it has never done so.

---

[17] Judge Brau testified by video deposition because after the deposition he was confirmed to serve as a Judge of the Court of Appeals of Puerto Rico.  Candelario objected to the testimony, pointing out that no ethical impediment prevented the witness from appearing and testifying at trial.  Docket No. 305 at ¶ 4; Tr. III at pp. 92:21-96:6; Tr. IV at p. 243:21-25.  The court overruled the objection.  <u>See</u>, Docket No. 305 at ¶ 4.

Judge Brau said that he would decide whether to read minutes and sign them. DX 95 at pp. 222:17-223:25. If he opted not to read them, the minutes would then be placed in the file without having been read by the judge even when, by his account, that meant the judge had approved them. DX 95 at pp. 228:12-229:21. He stated that reading the minute was not necessary, for if the judge thought he had a competent secretary he could delegate that responsibility. Id. He does not know if Judge Jiménez Nettleship told his Secretary to place the minute in the official file without his signature. DX 95 at pp. 231:14-232:25.

The court is not persuaded by Judge Brau's opinion that during the relevant period, judges in the CFI were not signing minutes that contained orders. It is true that some judges were not signing those minutes (again, the case here is an example), but that does not mean most of them were not doing it, most of the time, and that, as a matter of practice or custom, Rule 32(b) was being honored more in the breach than in the observance. Judge Brau testified that the judges he knew were not signing minutes. DX 95 at p. 21:2-6. The court has no way of knowing how many such judges there were in the CFI.[18] Without that foundational information, Judge Brau's opinion is of little utility here, and carries the drawback of small samples. See, Schuler v. Polaroid Corp., 848 F.2d 276 (1st Cir. 1988)(noting that sample was too small to permit any significant conclusions); Eagle-Picher v. Liberty Mutual, 829 F.2d 227, 232 (1st Cir. 1987)(rejecting a study in part because it drew broad conclusions from a small sample); Fudge v. City of Providence, 766 F.2d 650, 657 (1st Cir. 1985)(too small a sample insufficient to support proffered finding).

Plaintiff's expert, Judge Carlos Cabán, stated on cross examination that it is not uncommon to find minutes in case files that have not been signed by a judge, and that it is the rule rather than

---

[18] Pursuant to the Judiciary Act of Puerto Rico, Law No. 201 of August 22, 2003, there are 338 positions in the CFI: 253 Superior Court Judges and 85 Municipal Judges.

the exception.[19]  Tr. V at p. 127:15-21.  But he was not asked whether that impression referred to minutes with orders, that is, the type of minutes that on account of Rule 32(b) need to be signed by a judge and notified to the parties.  He also testified, however, that as a judge he had to apply Rule 32(b), Tr. V at p. 57:10-16, pointing out that Rule 32 requires a judge's signature in those circumstances where there is a resolution or order issued in open court.  Tr. V at p. 86:3-18; 88:12-15.  The fact that an unsigned minute is in a file is not a guarantee that the judge has approved it in a civil case.  Tr. V at p. 98:4-11.

Judge Brau testified that while sitting in the Court of Appeals he reviewed cases with minutes.  DX 95 at pp. 27:19-28:5.  He was not asked if those minutes were not signed.  If that is what he meant, those cases undoubtedly exist.  But the Court of Appeals handles petitions for review of administrative agencies, as well as civil cases and criminal cases.  See, Court of Appeals' Regulations, P.R. Laws Ann. tit. 4 App. XXII-B (2004), R. 13 (Civil Cases), R. 23 (Criminal Cases), and R. 56 (Administrative Cases).  And there is no evidence on what was the percentage of civil cases in the Court of Appeals' docket, or describing what fraction of those civil cases involved unsigned minutes with orders issued in open court.  Without those baselines, it is not factually feasible to conclude that it was the practice of judges in the CFI not to sign minutes containing orders or resolutions issued in open court.

Even more, the Court of Appeals has acknowledged the need to comply with the signature requirement of Rule 32(b).  In Dias Carrasquillo v. Soto Ortiz, 2012 WL 1912294, *2 (P.R. Court of Appeals March 30, 2012), the Court held that for a minute to be considered a judgment, order or resolution, it must be signed by a judge.[20]  In Vélez González v. Cooperativa, 2013 WL

---

[19] Judge Cabán served in the CFI and in the Puerto Rico Court of Appeals.  Tr. V at pp. 45:14-47:6.
[20] "Como se desprende de la Regla transcrita [Rule 32(b)], la minuta tiene que ser firmada por el o la jueza para que pueda acogerse como una resolución, orden o Sentencia".

7791414,*2 (P.R. Court of Appeals December 13, 2013), the Court noted that for a minute to be considered an enforceable judicial decision ("dictamen judicial ejecutable"), it must bear the signature of the judge who issued the order in question in open court.[21]  In León Cintrón v. Fulano de Tal, 2014 WL 859358, *2 (P.R. Court of Appeals January 24, 2014), the Court observed that it is a judge's signature that permits considering the minutes to be a judicial decision (dictamen), and referred to the judge's signature as a *sine qua non* requirement.  Id. at *3.  In Doral Bank v. De Jesús Maldonado, 2014 WL 5528237, *2 (P.R. Court of Appeals September 19, 2014), the Court held that the judge must sign the minute before it can be considered a resolution or order,[22] describing the signature requirement as indispensable.  Id. at *3.[23]

UBS contends that as of February 2007, when it decided to remove the restraints on Efrón's accounts, there was only one published decision on the subject in Puerto Rico, Rivera-Vega v. Cutler Hammer de Puerto Rico, 2005 WL 2614670 (P.R. Court of Appeals July 20, 2005) (Docket No. 357 at p. 13).  It argues that such case supports the decision it made to release the restraints, because it is consistent with its expert's opinion (who said that the norm in Puerto Rico is that "minutes generally do not comply with Rule 32(b)"), and that for that reason, it cannot be held to have acted unreasonably.  Id.

In Rivera-Vega, the petitioner asked the Puerto Rico Court of Appeals to review a trial court order denying the petitioner's request to amend the complaint.  The respondent argued that the Court of Appeals lacked jurisdiction because the order was issued in open court on April 6,

---

[21] Judge Brau – UBS' expert – sat in the panel.  He filed a dissenting opinion consistent with UBS' view here.  But he was not able to persuade the majority of his colleagues to accept that view in the case.

[22] "…[L]a minuta tiene que ser firmada por el o la jueza para que pueda acogerse como una resolución u orden."

[23] "…[L]a Minuta … adolece del **requisito indispensable** de la firma del Juez o Jueza que presidió la vista." (Emphasis added.)

and the petition was filed on May 7, beyond the 30-day period to do so.  The Court of Appeals

rejected the argument, noting that the order was transcribed (e.g. put in writing) on April 15.

Because the petition was filed less than 30 days later, it was timely.  The Court did not analyze

whether an order contained in a minute not signed by the judge is enforceable.

More important for the instant case, however, the course followed in Rivera-Vega does not

distract from the Court of Appeals' statement in November 2006 to the effect that the oral order

was not in a signed minute, and the matter was under the consideration of the CFI, awaiting a

written decision.[24]  As the First Circuit pointed out, "it does not take much to see that no judge

signed the minutes here." Candelario IV, 699 F.3d at 102.  And no written decision by a judge had

been issued before UBS released the restraints in February 2007.  So Rivera-Vega does not help

UBS.[25]

Judge Brau stated that Rule 32(b) is directed to court employees.  DX 95 at p. 91:8-13.

The Rules for the Administration of the CFI, of which Rule 32(b) is part, are organized in five (5)

sections ("partes").  Rule 32(b) is included in Section V, titled "Proceedings Relative to Judicial

Work" ("Procedimientos Relativos a la Labor Judicial").  It requires the judge's signature in

minutes containing resolutions or orders issued in open court.  On its face, the obligation is

imposed on judges rather than on administrative personnel or non-judicial staff.

Judge Brau pointed out that that there is a difference between validity and appealability,

saying that non-compliance with the requirements of Rule 32(b) only affects the appealability of

---

[24] UBS mentions a local Treatise on Appellate Procedure Law by Judge Hiram Sánchez-Martínez in connection with principles regarding interlocutory orders contained in minutes (Docket No. 357 at p. 77).  But the treatise does not examine the state of the law after adoption and implementation of Rule 32(b).

[25] Mr. Bobonis obtained a copy of the minute in Rivera-Vega from the Courts Administration's Central File, after Candelario initiated this action in 2008.  He did not review any cases or authorities before advising UBS on whether the restraints on Efrón's accounts should be lifted.  Tr. II at p. 33:10-18.

an order, not its validity,[26] and described the unsigned minutes as a "red herring."  DX 95 at pp. 68:5-69:14; 97:19-98:3.  He said that the most important document to determine whether UBS acted reasonably was Candelario's November 2006 petition for mandamus in the Puerto Rico Court of Appeals, stating that UBS had this document when it decided to lift the restraints, and the document shows that an oral order had been issued reversing the attachment.  DX 95 at pp. 176:22-177:9.

Puerto Rico courts have not limited the consequences of not complying with the requirements of Rule 32(b) to appealability.  In <u>Bonilla Rosario</u> v. <u>Dept. de Recursos Naturales y Ambientales</u>, 2010 WL 3964655, *2 (P.R. Court of Appeals June 16, 2010), the Court stated that to be valid, a minute including a resolution or order must be signed by the judge and notified to the parties.[27]  And in <u>Cotto Carrasquillo Ex Parte</u>, 2013 WL 1144263 at *2 (P.R. Court of Appeals February 1, 2013), the court held that the minute with an open court order authorizing the respondent to move the parties' children from Puerto Rico to Philadelphia had not been formally notified, and therefore, lacked effect.  <u>Id.</u>  By extension, it ruled that the respondent could not transfer the children until after the written order had been formally notified.  <u>Id.</u>

Those holdings comport with the First Circuit's conclusion that a minute with an order lacking the judge's signature is facially invalid.  While Judge Brau said that the First Circuit's opinion is contrary to custom and practice in Puerto Rico, DX 95 at p. 103:16-22, the factual basis for his conclusion is insufficient to accept his view as a fact in this case.  In like manner, it does

---

[26] DX 95 at p. 77:3-11; 92:15-21; 113:12-15.

[27] "Cuando se trata de una minuta que incluya una 'Resolución u Orden', ésta ha de ser firmada por el Juez a cargo de la sala y también será 'notificada a las partes' para que sea válida."

not account for the Court of Appeals' observation in November 2006 that the matter was before the CFI, under its consideration, and awaiting a written decision.

Even more, when the Court of Appeals issued the mandamus in July 2007, it did not mention the oral order despite the fact that the writing judge in that second mandamus case (Hon. Velázquez-Cajigas) was the writing judge in the first mandamus case of November 2006.[28] In line with that understanding, when the CFI – by way of Judge Sellés – finally ordered the sale of the assets in Efrón's accounts in August 2007, it also ordered UBS to **maintain** the accounts frozen. Why **maintain** the accounts frozen rather than ordering that they be frozen in the first place? Evidently, Judge Sellés acted on the logical assumption that those accounts had been restrained with the October 2006 attachment order, and that the order was never vacated after having been under advisement awaiting a written decision by the CFI.[29] Releasing the restraints on Efrón's accounts on the basis of a facially defective minute, without a written decision, when that issue was under the consideration of the CFI was inappropriate, overlooking what the supervising court – the Court of Appeals – expressly called attention in the Judgment addressed to the parties, and notified on remand to the CFI.

Judge Brau said that compliance with the signature requirement of Rule 32 would paralyze the judicial system.  DX 95 at pp. 92:22-93:9.[30] But the Puerto Rico Supreme Court adopted the

---

[28] Another judge, the Hon. Arbona Lago, also sat in both panels.

[29] In November 2007, Efrón sought review of the August 2007 Order in the Puerto Rico Court of Appeals.  In the process of affirming that Order, the Court observed that the minutes of the November 13, 2006 hearing were transcribed, were not signed by the judge who presided at the hearing, were certified by the Courtroom Services Clerk, and contained the CFI's orders regarding the attachment order.  Docket No. 38-27 at p. 17 n.5.  Nevertheless, it also stated that in connection with the First Petition for Mandamus (Case No. KLRX200600058), "the CFI's decision had been verbal and was under consideration and a written decision had yet to be issued."  Id. at p. 23.  That written decision – the one corresponding to the matter under the consideration of the CFI - was never issued.  And as stated above, no judge ever signed the draft order that Efrón submitted to the CFI.

[30] Mr. Bobonis believes it as well, pointing out that the system would collapse. Tr. II at pp. 140-141.

Rule in 2000, and maintained it in the amended set of rules for the CFI, promulgated in 2009.[31]

Surely it would not have done so if it were convinced that it had led to a breakdown or collapse in

the system.

### v.      Lorena Kern

Ms. Kern is the former head of retail compliance for Morgan Stanley Dean Witter.  Tr. VI

at p. 187:10-25.  She has worked for Merrill Lynch and Dean Witter, and now consults with broker

dealers on policies and procedures, and testifies as an expert witness on issues related to securities

law and other matters.  She testified that UBS's administration of Efrón's accounts was reasonable

and consistent with custom and practice in the financial services industry.  Tr. VI at p. 203:7-9;

205:9-10.  Her view of reasonableness was based on Ms. Colón's consulting with Mr. Bobonis,

and her opinion as to the adequacy of policies within the institution.  Tr. VI at p. 243:4-7.

Ms. Kern mentioned that UBS had a procedure for handling subpoenas, writs and

attachments, adopted a general policy statement that gave employees discretion and flexibility in

responding, provided employees with some guidelines as to how these things need to be handled,

and with resources available for guidance (a manager, local counsel, or in-house division counsel),

and gave instructions for the SLG Group to handle the mechanics of placing and removing

restraints on the accounts.  Tr. VI at pp. 203:9-11,19-20; 221:5-222:15, 245:16-25.  Likewise, UBS

Financial Services Compliance Bulletin, No. 06-15, dated September 21, 2006, "addresses the

Firm's policies and procedures for handling [. . . .] restraints."  PX 1.

This Bulletin applies throughout the United States and in Puerto Rico.  Tr. VI at p. 88:1-

25.  There are no specific local policies for Puerto Rico regarding the proper handling of subpoenas

---

[31] A copy of the Rules for Administration of the Court of First Instance of Puerto Rico (including the 2009 Amendments) is available at www.ramajudicial.pr.

and court orders.  After restraints are placed on an account, the matter is not deemed "closed" until "appropriate documentation" is received.   According to the UBS policy document entitled "Subpoena, Levy and Garnishment ('SLG') Group Restraint Procedures," the following documents are examples of "appropriate documentation:" Release of Levy, Consent Order, Order of Dismissal, and letter of authorization. PX 2 at p. 6, UBS bates-stamp 631.

UBS Compliance Bulletin 06-15 also states that once a legal restraint is placed on an account, it can only be "released upon receipt of a court order or other instructions from the court." PX 1 at p. 4.  In cases involving attachments, when court documents are in Spanish, the practice at UBS is for local Division Control employees to send the documents to the SLG group, and to prepare a summary setting forth what was being required of UBS.  This summary would be sent it to Weehawken, for review.

From this perspective, Ms. Kerns does not believe that a financial institution like UBS is presumed to know what a valid order looks like. Tr. VI at p. 249:15-18.  Rather, its obligation is to seek advice from counsel. Id. at lines 19-23.  But as the First Circuit held, the mere fact that UBS "had its lawyers look the minutes over before unfreezing Efrón's accounts," Candelario IV, 699 F.3d at 105, is insufficient to establish that it acted reasonably.  In that regard, it pointed out that UBS had the duty to review the documents for their "substantive content."  If not, the review would be an "empty exercise, which is something the law detests."   Id. at 100.  And here the review that was conducted overlooked what was apparent: the Puerto Rico Court of Appeals' November 2006 decision in the first mandamus case with a direct quote to Rule 32(b) requiring the judge's signature in the minute.  In addition, the Court expressly stated that the oral order was not in a signed minute, and even more, that the matter was under the consideration of the CFI, awaiting a written decision (dictamen).

Ms. Kern admitted that she was not opining on the law, but on industry practice and the reasonableness of UBS' conduct.  Tr. VI at p. 242:10-15.   Nonetheless, she acknowledged that a financial institution like UBS has a duty to review the documents it receives, and that the review should not be an empty exercise.  Tr. VI at p. 250:4-251:1.  The facts show that the reviewing exercise here was empty.  UBS was negligent in giving effect to an unsigned minute in February 2007 in violation of the October 2006 Writ of Attachment, despite the Court of Appeals' explicit finding in November 2006 that the matter was still under the consideration of the CFI and awaiting a written decision.[32]

### vi.    Miscellaneous

UBS contends it cannot be found negligent because in October 2006 it complied with each order that it received concerning Efrón's accounts, including the October 2006 attachment order and the August 2007 order of sale (Docket No. 357 at pp. 74-75).  That UBS complied with those orders is undisputed.  But it released restraints when it should not have done so.  It cannot be faulted with acting deliberately to cause damages, but article 1802 of the Civil Code contemplates both fault and negligence.  See, P.R. Laws Ann. tit. 31 § 5141.  UBS may not have acted with fault, but acted with negligence.  See, Haley v. Nilo Transp., 2009 WL 2143530, *4 n.5 (D.P.R. July 9, 2009) (distinguishing between "fault" and "negligence").  And negligence triggers liability for the damages that it causes.  That is the case here, pure and simple.

---

[32] As previously noted, Mr. Bobonis acknowledged that he did not discuss with Ms. Colón the Court of Appeals' opinion or the requirements of Rule 32(b).  Tr. II at p. 41:18-42:1.  Moreover, the unsigned minute mentions the attachment order, and payments owed to Candelario, stating that payments had to be made immediately. DX 25, UBS bates-stamp no. 45. It is silent on whether setting aside the attachment order was immediate. The distinction was not reviewed for significance in light of the other materials that Efrón provided to UBS in February 2007.

### B.  Damages

#### 1.  Obligation

In Puerto Rico, damages consist of compensation in money for loss caused by the wrongful act or omission of another.  García-Pagán v. Shiley Caribbean, 122 D.P.R. 193, 205 (1988).  A damages award seeks to make a party whole, placing her in the position she would have occupied had the wrong not occurred.  Rivera v. Tiendas Pitusa, Inc., 148 D.P.R. 695, 700 (1999).  On October 20, 2006, the CFI required UBS to freeze Efrón's accounts, to liquidate investments totaling $4,160,522.61, and to remit the proceeds to the court.  On October 27, 2006, UBS filed a motion stating that Efrón lacked enough cash to satisfy the amount set forth in the writ of execution and requesting instructions regarding which of the assets to sell.  On February 15, 2007, UBS improperly released the restraints on Efrón's accounts.  At that point, the accounts had assets worth $12,186,926.55.

In August 2007, the CFI ordered UBS to pay Candelario $4,160,512.61, and to keep Efrón's accounts frozen until payment of interest could be determined for unpaid amounts and until the court ordered otherwise. UBS paid Candelario $351,783.13.  It should have paid her $4,160,512.61, and thus owes her the difference between what it should have paid and what it in effect paid.  Correspondingly, it became liable to Candelario for $3,808,739.48 ($4,160,512.61 - $351,783.13).  The loss was not unforeseeable or random.  The obligation is ongoing, and generates principal with state-imposed interest as part of the obligation itself every day that it remains unpaid.

#### 2.  Assets

UBS asserts that the maximum amount of its liability must be measured by the accounts' net value - the difference between the value of the assets less the amount owed to the credit line -

at the time of the liquidation order (Docket No. 357, at p. 123).  Candelario challenges UBS, pointing out that liability should be gauged against all of the assets that Efrón had in the accounts (approximately $12 Million) before he depleted them (Docket No. 355 at p. 117).

In January 2010, the court (Casellas, J.) held that UBS properly paid off the balance in Account JX-60059 before paying Candelario.  See, Candelario I, 691 F.Supp.2d at 304, *vacated*, 699 F.3d 93 (1st Cir. 2012) ("The Court finds that insofar as Account JX-60059 was pledged as a Collateral Account for loan Account 5V50203, UBS acted correctly in paying off loan account 5V50203 with the funds from the former").  This particular holding was subsequently set aside by operation of the First Circuit's *vacatur* of the entire summary judgment ruling.

On remand, the court ruled that without evidence that UBS Bank USA demanded payments (and when and under what circumstances), the amount by which UBS' compliance with the October 2006 attachment order was to be measured, was the total (not the net) value of assets in Efrón's accounts as of that date.  Candelario III, 81 F.Supp.3d at 155.  Based on the evidence presented at trial the court adopts its original holding.

In August 2006, Efrón and UBS Bank USA entered into a Credit Line Agreement.  The line of credit was secured by a first priority lien in favor of UBS Bank USA, to be exercised against accounts held by Efrón with the security intermediary, which was UBS.  See, Docket No. 23, Exh. IS at Section 8(a).  The Agreement provided for UBS to abide by all entitlement orders and instructions given by the Bank regarding the collateral accounts, without need for consent from Efrón.  Id. at Section 9(a).  Efrón, for his part, could trade financial assets within the collateral accounts and could also issue entitlement orders and instructions to UBS regarding those accounts, unless the Bank notified UBS that it was asserting exclusive control over the account, at which point UBS was prohibited from acting on orders or instructions from Efrón.  Id. at Section 9(b).

The Agreement gave the Bank the right to secure payment of the credit line obligations when the debt became due, by set-off against Efrón's UBS investments. Id. at Section 8(a). The debt would become due in the event of a "demand" by the Bank for full or partial payment of the credit line obligations. That demand could be made at any time, at the Bank's absolute discretion. Id. at Section 2(b). Moreover, the agreement provided that notification of demand could be made orally or in writing unless otherwise required by law. Id. at Section 20.

To that end, the Bank had discretion to terminate or cancel the line, in which event Efrón would have to pay the totality of the credit line obligation. Id. at Section 2(h). Nevertheless, under Section 10, the entire obligation would come due if a collateral account was attached or subjected to a levy, at which time the Bank could, "in its sole and absolute discretion liquidate, withdraw or sell all or any part of the Collateral and apply the same [ . . . ] to any amounts owed to the Bank . . ." Id. at Section 10(a).

Candelario asserts there is no evidence that the Bank called in the line, accelerated the debt, or in fact, demanded that Efrón make certain payments. She claims that when the accounts were attached, the Bank did not exercise its contractual right to accelerate the debt, and that at no other point did it make a "demand," as it could have under the agreement. Similarly, she states that the Bank never exercised its rights to call in the line of credit, and that there is no evidence that the Bank called in the credit line until the end of August 2007, when Judge Sellés's sales order was served on UBS. UBS contends that demand was not required, and that the Bank did exercise its rights.

A security interest in investment property may be perfected by control. Candelario VII, 81 F.Supp.3d at 153. Both Utah law (Utah Code Ann. § 70A-9a-313(1)), which governed the Credit Line Agreement with Mr. Efrón, and the UCC, so permit. Candelario VII, 81 F.Supp.3d at 153.

In the case of investment property held through a securities intermediary (UBS), the secured party (UBS Bank USA) could perfect by control transferring securities to an account in its own name; becoming the entitlement holder, arranging for the securities intermediary to act on instructions from the secured party to dispose of the positions, even though the debtor remains the entitlement holder. Id.[33]

Puerto Rico has adopted the UCC articles applicable to investment property and secured transactions.  See, Commercial Transactions Act, P.R. Laws Ann. tit. 19 §§ 401-2207, with relevant provisions similar to the Utah UCC.  The Commercial Transactions Act provides that filing is not required to perfect "[a] security interest in investment property which is perfected without filing under § 2015 or § 2016 of this title." Id. at Section 2102(h).  Instead, it recognizes that "[a] description of collateral in a security agreement or financing statement is sufficient to create or perfect a security interest in a[n] [investment property]," Id. at Section 2015(3), and that "[a] security interest in investment property may be perfected by control," Id. at Section 2015(4)(a).  And along the same line, it provides that control exists where the securities intermediary has agreed to comply with entitlement orders originated by the [secured party] purchaser without further consent by the entitlement holder. Id. at Section 1706(d)(2).

These conditions appear to have been satisfied.  As to the priority to be accorded this interest, the Commercial Transactions Act accepts that "[a] security interest of a secured party who has control over investment property has priority over a security interest of a secured party who

---

[33] See, Utah Code Ann. § 70A-9a-314 ("A security interest in investment property . . . may be perfected by control of the collateral under . . . Section 70A-9a-106."); Section 70A-9a-106(1) ("A person has control of [investment property] as provided in Section 70A-8-105."); Section 70A-8- 105(4)(b) (a secured party "purchaser" has control where "the securities intermediary has agreed that it will comply with entitlement orders originated by the [secured party] purchaser without further consent by the entitlement holder"); § 70A-1a-201(2)(cc) & (dd) (defining "purchaser," as used in the UCC, to include a person who takes by "lien," "security interest," "or any other voluntary transaction creating an interest in property"); see also, Section 70A-9a-309(10) (automatic perfection of "a security interest in investment property created by a broker or securities intermediary").

does not have control over the investment property." Id. at Section 2015(5)(a).   In these circumstances, as recognized earlier in this litigation, it is fair to conclude that UBS Bank USA had a perfected security interest in Efrón's assets.  Candelario VII, 81 F.Supp.2d at 154.

On a different level, the Credit Line Agreement states that UBS Bank USA could "... demand full or partial payment of the Credit Line Obligations, in its sole and absolute discretion and without cause, at any time" (Docket No. 23, Exh. 1S, Section 10(b)).  In the event a collateral account were attached or subject to a levy (Section 10(a)(vii)), the credit line obligation would immediately become due and payable, and UBS Bank USA could, in its "sole and absolute discretion liquidate, withdraw or sell all or any part of the collateral and apply the same [ . . . ] to any amounts owed to the Bank . . ." Id. at Section 10(a).

Section 10(a) of the Agreement also provides that no demand (call) or notice is required to liquidate the securities in a collateral account where collateral provided by a loan or any portion of it terminated, attached or subjected to a levy.  Because this case involves one of the events specified in the agreement, there was no need for a formal demand or call.  Additionally, the evidence shows that UBA Bank USA promptly requested UBS specifically to act on Efrón's collateral account after it was attached in October 2006, to insure payment of the credit line in the event Candelario obtained a liquidation order.  Craig Darvin, attorney for UBS Bank USA, communicated with Adrea Wolff, UBS Division Counsel, to ensure that the credit line would be paid off, with first priority over all other claimants to the collateral in Efrón's account.  Tr. IV at pp. 53:12-54:5; 156:19-21.

All in all, UBS Bank USA had a perfected interest in Efrón's collateral-account assets, had control over those assets, could liquidate the account without demand and apply the proceeds to pay off the credit line, and communicated with UBS to make sure that the loan on credit in Account

5V-50203 was paid.  So, as originally held, "as of February 2007, Efrón's accounts had sufficient funds to satisfy said loan, as well as the Order and Writ of Execution." Candelario I, 691 F.Supp.2d at 304.[34]  Therefore, "the payment of Loan Account 5V-50203 would not have adversely affected" Candelario.  Id. [35]

### 3.  Adjustments: Principal and Interest

Candelario received $215,000.00 from Efrón between June 2001 and August 2002, and $200,000.00 from Efrón between November 2006 and January 2007.  Candelario VII, 81 F.Supp.3d at 156.  She recovered $587,640.00 ($608,827.00 less fess) from Efrón's accounts in Banco Santander between 2009 and 2010.  Id.  The court previously ruled that UBS may deduct those amounts ($1,002,640.00) from the amount owed.  Id.  A clarification, however, on the proper allocation between principal and interest is required to implement the judgment here.

The amount owed is made up of two components: (1) $50,000.00 ongoing monthly payments as principal; and (2) 10.50% interest on unpaid amounts from June 2001, imposed by the CFI when it originally set the monthly payment to be made.  As of October 2006, when the accounts were attached, that obligation amounted to $4,160,512.61, which the August 2007 sales order sought to satisfy.  Nevertheless, because the obligation contains an interest component, UBS must apply the $1,002,640.00 to reduction of interest.

Pursuant to Article 1127 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 3177, payments on interest-bearing obligations must first be applied to interest, then to the principal.  Id.

---

[34] More to the point, there were $4,667,750.77 available in Efrón's accounts ($12,144,724.88 in assets less $7,486,974.11 on the credit line) to comply with the attachment order and pay Candelario.  Tr. VI at p. 154:5-23.

[35] Candelario noted that so-called "Close-End Funds" represented the overwhelming majority of Efrón's assets, and UBS' Prospectus prohibited their pledge as collateral to entities outside of Puerto Rico like UBS Bank USA (Docket No. 305 at ¶ 5; Tr. V at p. 193).  To that end, she sought to present the Prospectus in evidence, to which UBS objected.  The court sustained the objection, considering the prospectus newly announced evidence (Docket No. 305 at ¶ 5).  Notwithstanding the asserted prohibition, sufficient funds remained in Efrón's accounts to pay Candelario.

If UBS had not negligently released Efrón's accounts, it would have been able to satisfy the amount that the Order provided for.  A significant part of the $4,160,512.61 remains unpaid.  That part is subject to the state interest component of the obligation, which will continue to accumulate until it is satisfied.  Thus, the $1,002,640.00 must be applied to interest.  The parties stipulated that if the Opinion and Order so provided, it would result in a damages calculation of $5,330,019.00 as of December 31, 2014, accruing interest of $26,550 per month thereafter (Docket No. 339 at ¶ 4).  With that in mind, as of today, Candelario is owed $5,728,269.00,[36] from which the $1,002,640.00 attributed to interest must be deducted, for a net of $4,725,629.

### C. <u>Comparative Negligence</u>

UBS alleges that Candelario was negligent, and completely responsible for her loss (Docket No. 357 at p. 98).  Puerto Rico is a comparative negligence jurisdiction.  As codified in Article 1802:

> A person who by an act or omission causes damage to another through fault or by negligence shall be obliged to repair the damage so done.  Concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity.

> P.R. Laws Ann. tit. 31 § 5141.

The comparative negligence standard was adopted in 1956 to replace the common-law doctrine of contributory negligence.  Carlos J. Irizarry Yunque, *Responsabilidad Civil Extracontractual* 253 (6th ed. 2007).  It abolishes doctrines that give all-or-nothing effect to certain types of plaintiff's negligence.  At its core, if a plaintiff's own conduct is one of the adequate causes of her harm, then her award is reduced in proportion to the percentage of the harm she

---

[36] $5,330,019 + $398,250 (corresponding to $26,550 x 15 months beginning on January 1, 2015).

caused herself.  Ruiz Troche v. Pepsi Cola of P.R. Bottling Co., 177 F.R.D. 82, 90 (D.P.R. 1997), *rev'd*, 161 F.3d 77 (1st Cir 1998).

Candelario alleges that comparative negligence is not applicable in this case because the concept focuses on the cause of the initial injury-producing event and thus, on whether plaintiff contributed to production of the injury, rather than on subsequent events such as those UBS is essentially relying on (Docket No. 352, at p. 113: 23-25; Docket No. 55, at p. 98).  The Puerto Rico Supreme Court does not appear to apply that strict timing standard.  In Castro Ortiz v. Mun. de Carolina, 134 D.P.R. 783 (1993), the plaintiff was held to have been negligent in waiting eight hours to seek medical attention for an eye injury caused while mowing grass, and the physician who then treated the plaintiff thereafter was found to have aggravated the damage by not adequately examining plaintiff or referring plaintiff to an ophthalmologist.

The Court applied comparative negligence principles to apportion damages, holding plaintiff 75% responsible, Id. at 794, without making a distinction between negligence that occurred before, and negligence that occurred after, the initial injury.  Thus, negligent conduct may occur at different times; post-injury negligence can extend or aggravate the harm to the claimant's detriment.

UBS alleges that what Candelario and her legal team did or failed to do between October 2006 and August of 2007 was negligent on various fronts (Docket No. 357 at pp. 91-99).  It argues that errors and mistaken tactical decisions precluded her then, and preclude her now, from recovering the full amount of the attachment order and interest accrued on Efrón's obligations since September 2007 (when UBS gave her the $351,000.00 check).  Id.

First, UBS contends that Candelario's attorneys should have drafted an attachment order similar to the Order of Sale issued by Judge Sellés in 2007.  Id. at p. 92.  But the loss here was not

caused by errors in the October attachment order.  Had UBS not released the restraints in February

2007, it would not be liable to Candelario.

Second, UBS claims that Candelario should have requested notification of the November

2006 hearing minutes (Docket No. 357 at p. 95).  It maintains that when a party does not request

notification of an oral interlocutory order, the Court of Appeals evaluates the timeliness of an

appeal by reference to the date on which the minutes are prepared, and that by the time Candelario

obtained the minutes, an appeal would have been deemed untimely.  Id. at 96.  During trial,

Candelario's attorney – Ms. Pirallo – testified that there was no need for her to request minutes,

because the CFI has the obligation to notify the parties with copy of the minutes. Tr. VII at pp.

30:2-7; 40:16-41:9.  Her view comports with Puerto Rico law.

Rules 65.3(a) and (b) of the Puerto Rico Rules of Civil Procedure in effect during 2006 and

2007, P.R. Laws Ann. tit. 32, Ap. III (1979), unambiguously state that the Clerk of the Court shall

notify ("notificará") the parties of judgments, resolutions or orders, and of their registry and filing.

And in Caro v. Cardona, 158 D.P.R. 592 (2003), the Puerto Rico Supreme Court held, relying in

part on Rule 65.3, that the correct and timely notice of judgments, resolutions and orders is a *sine

qua non* requirement of an ordered judicial system. Id. at 595.  Likewise, in Martínez, 2005 WL

1379372 at *9, the Puerto Rico Court of Appeals held that it is incumbent upon the CFI to notify

minutes.[37]

Ms. Pirallo testified that Efrón's attorney had said during a hearing in a related case on

February 5, 2007, that there were minutes of the November 13th hearing (minutes of which Ms.

Pirallo had not been notified). Tr. VII at pp. 30:15-31:4.  Ms. Pirallo asked that attorney for a copy

of those minutes, but never received them. Tr. VII at p. 31:4-8.  She sent a law clerk to the CFI to

---

[37] "[C]orrespondía al T.P.I. hacer la correspondiente notificación."

get a copy of the minutes, to no avail, because the law clerk was not given access to the file.  Tr. VII at pp. 31:12-32:3. Instead, he was told that Ms. Pirallo was not an attorney of record. Id. Then Ms. Pirallo went to the CFI to review the file herself but the Clerk denied her access, informing her that she was not counsel of record.  Ms. Pirallo filed two (2) urgent motions requesting the minutes. PX 26. For a reason yet to be explained, the motions were not immediately acted on. Eventually Ms. Pirallo was allowed to examine the file, and saw unsigned minutes that were yet to be officially notified.  Those events do not sustain the proposition that Candelario – through her attorney - was negligent.

Third, UBS faults Candelario for not realizing until May 2007 that the minutes did not have a judge's signature.  It argues that if it (UBS) was negligent, Candelario was comparatively negligent because Candelario's court filings discussing the effect of the CFI's rulings were part of the body of materials that UBS and Bobonis considered, and Candelario did not call or send any letters to Mr. Bobonis to state that the absence of the judge's signature was an issue here (Docket No. 357 at p. 105).

The argument falls short.  Candelario did not have access to the official court file until after UBS had released the restraints.  In the meantime, she filed the first mandamus petition in the Court of Appeals.  In turn, the Court of Appeals issued a decision (1) quoting Rule 32(b), (2) stating that the oral order was not in a signed minute, and (3) pointing out that the matter was still under the consideration of the CFI, awaiting a written decision.  As previously discussed, UBS was aware of those statements before it released the restraints.  It cannot blame Candelario for its decision to do so, because it was privy to the procedural description of the case that the Court of Appeals had made in November 2006.

Fourth, UBS maintains that Candelario was negligent in not communicating with Mr. Bobonis until February 2007. To explain why, it asserts that when it released the accounts, it had the appellate filings and nothing else from Candelario, that by the time Ms. Pirallo wrote to Mr. Bobonis in February 2007 the accounts had been released, and that Ms. Pirallo's letter "was so suspect and contrary to what Bobonis knew to be the case, that he immediately concluded that it had been written to mislead UBS" (Docket No. 357 at p. 108). Thus, for UBS, the letter created immediate suspicion in a way contrary to what a diligent party should have done to preserve her claims to Efrón's accounts. Id.

In that regard, the letter points out that the minute had not been notified (which was true), and without official notice, the oral order was not beyond review. As stated earlier, in the absence of notice, the period to seek interlocutory review had not begun. Besides, when UBS released the restraints on Efrón's accounts, it had copy of the Court of Appeals' judgment of November 2006, and acted without a written decision to which the Court of Appeals had referred, even though, as the Court of Appeals observed, the matter was under the consideration of the CFI. It was UBS who decided to release the restraints in those circumstances, not Candelario.

Fifth, UBS' expert (Judge Brau) testified that Candelario's damages are self-inflicted, noting that her attorneys failed to follow proper appellate procedures. DX 95 at pp. 75:20-76:2; 82:7-83:21. He said that a mandamus was an incorrect procedure for an interlocutory order and incorrectly suggested to the Court of Appeals that the CFI had failed to act rather than stating that the CFI had made a ruling that they had sought to challenge. DX 95, at pp. 75:17-76:14. It is conceivable that other attorneys may have adopted a different strategy. But the Court of Appeals entertained the mandamus petition that Candelario's attorney had filed as a petition for *certiorari*, and stated that the matter was under the consideration of the CFI, awaiting a written decision. The

statement should have served as a red flag to UBS, leading it to realize that a written decision was needed.  As for the substantive argument that Candelario's attorneys raised - that Judge Jiménez Nettleship acted without authority - the argument was adopted by the Court of Appeals in its July 2007 decision granting the second mandamus petition.  It was not Candelario who acted negligently, but UBS.

Sixth, UBS posits that Ms. Pirallo should have requested the Court of Appeals to issue an order under Rule 83.1 of the Court of Appeals' Regulations, P.R. Laws Ann. tit. 4 App. XXII-B (2004).  See, Docket No. 357 at p. 48.  Rule 83.1 authorizes the Court of Appeals to order the CFI to explain the reasons for its decision while retaining jurisdiction over the case.  The court cannot retain what it does not have.  There was nothing for Candelario to request at that point.  Still, disposing of the case the Court of Appeals stated that the matter was under the consideration of the CFI, awaiting a written decision.  UBS should have waited for that written decision or at least asked the CFI for guidance instead of releasing the restraints.

Seventh, UBS states that Candelario's attorneys should have attached Efrón accounts in other institutions as a means of assuring execution of the judgment (Docket No. 357 at p. 93).  Ms. Pirallo testified that Efrón's assets in UBS would have sufficed to satisfy Efrón's debt to Candelario.  She correctly pointed out that from the point in 2003 or 2005 when she received information about Efrón's accounts in UBS, and the point where the order of attachment was served on UBS in 2006, Efrón had not moved the assets to another institution.  Tr. VII at pp. 44:8-19; 45:3-9.  Additionally, she exchanged letters with Mr. Bobonis, who opted not to inform her of UBS' decision.

Even though Candelario testified that Efrón is "dishonest" and would do whatever possible to keep assets from her (Docket No. 357 at p. 93), her counsel, mentioned that Candelario had been

unable to obtain another attachment order for two years due to court proceedings in the Efrón

litigation. Tr. VII at pp. 48:19-24; 54:12-57:23.  Considering the contentious character of such

litigation, her testimony was credible.  The court is persuaded that all things considered, it was not

unreasonable for Candelario to assume that UBS would refrain from lifting the restraints rather

than permit Efrón to make withdrawals after February 15, 2007, and for that reason, that she did

not act negligently as UBS states.

### D.  <u>Statute of Limitations</u>

UBS alleges that plaintiff's action is time barred (Docket No. 357 at p. 111).[38]  Tort claims

in Puerto Rico are subject to the one-year limitations period set in Article 1868 (2) of the Civil

Code, P.R. Laws Ann. tit. 31 § 5298(2).  <u>Rivera-Carrasquillo</u> v. <u>Centro Ecuestre Madrigal, Inc.</u>,

812 F.3d 213, 215 (1st Cir. 2016).  The one-year clock begins ticking from the time the aggrieved

person had knowledge of the existence of her claim.  To have knowledge that she has a claim –

thereby triggering the countdown – a person needs to be aware not only that she has been injured,

but also needs to know who is (or may be) responsible for that injury.  <u>Id.</u> at 215-216.

The Puerto Rico Supreme Court recognizes two types of knowledge as sufficient to start

the clock.  First, a plaintiff may have actual knowledge of both the injury and of the identity of the

person who caused it.  In that case, the one-year period begins to run on the date a plaintiff obtains

this knowledge.  <u>Id.</u> at 216.  Second, alternatively, a plaintiff is deemed to be on notice of her cause

of action if she is aware of certain facts that, with the exercise of due diligence, should lead her to

acquire actual knowledge of her cause of action.  The test for this so-called "deemed knowledge"

is an objective one.  Under Puerto Rico law, deemed knowledge is essentially parlance for the

---

[38] In <u>Candelario I</u>, the court rejected a similar argument.  <u>See</u>, 691 F.Supp.2d at 300.  At Docket No. 305 it permitted the issue to
be readdressed. <u>See</u>, ¶ 6.

discovery rule, which stands for the proposition that the one-year statute of limitations does not begin to run until the plaintiff possesses, or with due diligence would possess, information sufficient to permit suit.  Id.

      With that mind, the statute of limitations begins running at the time a reasonably diligent person would discover sufficient facts to allow her to realize that she had been injured and to identify the party responsible for that injury.  Id.  The rationale being that once a plaintiff comes into that knowledge, she can file suit against the tortfeasor.  Id.  By exception, where the tortfeasor, by way of assurances and representations, persuades the plaintiff from filing suit, or otherwise conceals from the plaintiff the facts necessary for her to acquire knowledge, the statute of limitations will be tolled.  Id. at 216, n.3.  Determining the date on which a diligent plaintiff would have learned enough to allow her to file suit, presents a question of fact that may be submitted to the jury or the appropriate factfinder.  Id. at 216.

      On a different level, notice of the injury occurs when there exists some outward or physical signs through which the aggrieved party may become aware and realize that she has suffered an injurious after effect, which when known becomes a damage even if at the time its full scope and extent cannot be weighed.  Torres v. E.I. Dupont de Nemours & Co., 219 F.3d 13, 18-19 (1st Cir. 2000).  If the ignorance is due to lack of diligence of the injured party, the limitations period runs from the time she should have known, through reasonable inquiry.  Pan Am. Grain, Inc. v. De la Cruz, 2013 WL 496142, *2 (D.P.R. Jan. 31, 2013).

      UBS argues that Candelario had notice of the injury more than one year before filing this lawsuit.  It states this is reflected in her April 20, 2007 motion seeking notification of the hearing minutes, in which her attorney wrote that Candelario was in a "state of defenselessness," that "UBS Financial, through its counsel, Guillermo Bobonis, insists, despite our warnings. . . that the verbal

order issued by then Judge Charles Jiménez-Nettleship has legal effects and consequences, implying that it will unfreeze the funds attached at UBS," and that "[t]his action by UBS has the effect of placing the money [sic] deposited there at risk given the possibility of transfer by Atty. David Efrón" (Docket No. 357 at p. 112)   It posits that to that end, she asked the CFI to order UBS to "maintain frozen the funds and/or investments deposited in the name of Atty. Efrón." Id. at p. 113.

On that basis, UBS argues that, like the plaintiff in Pan American Grain, these statements by Candelario's attorneys establish that Candelario "must have known, or at least suspected…of the alleged injuries and economic drawbacks" more than one year before filing this lawsuit.  Id. By extension, it maintains that Candelario could not abdicate her obligation to make "reasonable inquiry," Pan Am. Grain, Inc., 2013 WL 496142 at *2, or "'wait for [her] injury to reach its final degree of development [to] postpone the running of the period of limitation according to [her] subjective appraisal and judgment.'"  In consequence, it claims, it is entitled to a judgment dismissing this case (Docket No. 357 at pp. 106-107).

In Pan Am. Grain, plaintiff filed suit against Puerto Rico Coffee Toasters LLC and others, requesting damages sustained as a result of defendants' interference in a contract executed between plaintiff and Café Yaucono Inc.  Defendants moved to dismiss on timeliness grounds.  The court granted the motion, pointing out that on the basis of plaintiffs' allegations, the damages allegedly suffered as a result of the tortuous interference dated back to April 8, 2008, the date the contract between plaintiff and Café Yaucono reached an abrupt end, that plaintiff must have known or suspected by May 8, 2008, of the alleged injuries and economic drawbacks that withdrawing from the contract with Café Yaucono would generate; and that plaintiff was aware that one of the defendants improperly and in bad faith interfered in their relationship with Café Yaucono when it

decided not to go ahead with the partnership contract.  The allegations were that, at the moment of withdrawal from the contract, plaintiff was aware of both the injury and the identity of the tortfeasor, which for purposes of Puerto Rico's statute of limitations for tort actions, starts the one year period to file a claim.  Since the action was filed more than one year later, the complaint was time barred.

From that framework, it is apparent that the action here is not time barred.  The legal reasoning behind a plaintiff's loss of rights under a statute of limitations is that the plaintiff is deemed to have abandoned those rights.  Rodríguez-Suris v. Montesinos, 123 F.3d 10, 14 (1st Cir. 1997).   In order for this legal reasoning to apply, an abandonment on the part of the plaintiff should really exist.  Id.  Candelario cannot be charged with "lack of diligence," much less with "abandonment."

Candelario was actively pursuing remedies in court, and in communication with Mr. Bobonis.  At no point prior to August 2007 she was informed that most of the assets in Efrón's accounts were gone.  Tr. at pp. 192-193.  Nor was she told that assets served as collateral for a credit line that UBS would pay off prior to making payments to her.[39]  The condition attached to a plaintiff's right of tolling – the condition that she act with care to make additional inquiries once she is on notice – does not apply (or is excused, or negated), when plaintiff reasonably relies on what others told her.  Rodríguez-Suris, 123 F.3d at 14.

After the April 2007 letter to Mr. Bobonis upon which UBS relies, Candelario filed a motion with the CFI specifically asking the Court to maintain the funds and/or investments frozen. DX 47, p. 194 at ¶ (d). Had UBS disregarded the attachment order by lifting the restraints in the

---

[39] Mr. Bobonis stated that it would have been improper for UBS to provide that information without a court order or the client's consent.  Tr. II at pp. 192-193.  Fair enough, but the absence of information cannot be held against Candelario.

accounts but paid the full amount to Candelario, UBS would not have damaged her.  By extension, reasonable knowledge of the injury can only be attributed to Candelario on the date her counsel went to UBS to collect what turned out to be $351,000.00.  Using Pan Am. Grain's terminology as an analogy, that was the date defendant "decided not to go ahead with the partnership contract."

### E.  Attorney's Fees

Candelario alleges that the court should enter a finding of "obstinacy" against UBS and impose prejudgment interest and attorneys' fees pursuant to Rules 44.1(d) and 44.3(b) of the Puerto Rico Rules of Civil Procedure, P.R. Laws Ann. tit. 32, App. V, R. 44.1(d), 44.3 (b)(Docket No. 356 at p. 1).  She argues that imposition of pre-judgment interest from the date of filing of the complaint is appropriate at the applicable legal rate (in addition to the 10.5% interest on the underlying obligation), and that with regard to attorney's fees, UBS should be obligated to pay her attorney's fees equal to the market value of the total time her attorneys have dedicated to this case since the date of the first remand in mid-2010 or, in the alternative, in the same amount as UBS has paid to its own attorneys during the same period.  Id. at p. 12.  UBS essentially counters that there is nothing justifying what Candelario requests (Docket No. 358 at pp. 1-2).

The general "American Rule" is that each side bears its own litigation costs and that the prevailing party is not entitled to recover attorney's fees.  See, In re Puerto Rican Cabotage Antitrust Litigation, 815 F.Supp.2d 448, 457 (2011)(so noting).  By exception, Rule 44.1(d) provides in part that: "In the event any party or its lawyer has acted obstinately or frivolously, the court shall, in its judgment, impose on such person the payment of a sum for attorney's fees which the court decides corresponds to such conduct."  In turn, Rule 44.3(b) provides for a mechanical calculation of prejudgment interest to be applied in case of obstinacy or frivolousness, based on the applicable rate in effect when judgment is pronounced.  Dopp v. Pritzker, 38 F.3d 1239, 1252

(1st Cir. 1994).   In a diversity case in which the substantive law of Puerto Rico supplies the basis of decision, a federal court must give effect to these rules.  Id.

The purpose behind Rule 44.1(d) and Rule 44.3(b) is not to compensate the prevailing party, but to penalize a losing party that because of its obstinacy and insistent frivolous attitude has forced the other party to assume the pains, costs, efforts, and inconveniences of a litigation, needlessly.  Id. at 1252-1253.  Consequently, attorney's fees and prejudgment interest are payable only if the offending party's behavior results in a litigation that could have been avoided, or prolongs the litigation needlessly, or obliges the other party to embark on needless procedures. Id. at 1253.  Once the court determines that a party has been obstinate, the imposition of attorney's fees and prejudgment interest is obligatory.  IOM Corp. v. Brown Forman Corp., 627 F.3d 440, 452 (1st Cir. 2010).

### 1.  Candelario's Perspective

Candelario alleges that UBS should be sanctioned for temerity (Docket No. 356 at p. 3). She complains that UBS has pursued a litigation strategy "based not on the search for truth, but rather on an interest in obfuscation and delay," and that along the way, UBS has showered her with unwarranted accusations, to the point of claiming that she had engaged in fraud upon the court, a claim UBS made not only in this court but also before he First Circuit.  Id.  She states that:

- UBS changed its position somewhat after the First Circuit remanded the case for trial (Docket No. 355 at p. 119).  Until remand, UBS had argued that its duty was limited to examining the minutes for facial validity, but after the First Circuit eliminated that argument, UBS shifted its position to reliance on an experienced attorney, Candelario's counsel's expressions in her appellate

filings, and that it was Ms. Pirallo who was negligent and caused Candelario's damages.  Id.

- In 2009, a key UBS witness, Ms. Colón, made material misstatements in a declaration under penalty of perjury submitted in support of UBS' motion for summary judgment, at a time when the primary attorney for UBS (Mr. Bobonis) also had personal knowledge of the falsity of the statements (Docket No. 356 at pp. 3-4, 7).

- The declaration affirms that on or about February 15, 2007, UBS received six documents, namely: (a) the minutes; (b) Candelario's Petition for Mandamus in the Court of Appeals and her Motion in Aid of Jurisdiction; (c) the Court of Appeals' Judgment; (d) Candelario's Petition for Certiorari with the Puerto Rico Supreme Court, and the Urgent Motion filed with in connection with the Petition; and (e) the Resolution of the Supreme Court.

- Candelario maintains that the statements in the declaration are not true because on February 14, 2007, Efrón provided only 24 pages to UBS, consisting of the minutes, the Petition for Mandamus, a Motion in Aid of Jurisdiction, and the November 21, 2006 Judgment of the Court of Appeals (Docket No. 355 at pp. 62-63).  Thus, Candelario argues that it would have been impossible for UBS to have seen the Supreme Court resolution, since it had not yet been officially notified to the parties. Id. at p. 63.

- Along the same line, Candelario complains that in UBS' answers to interrogatories, Ms. Colón stated that when she spoke to Mr. Bobonis, he told her that "all of Ms. Candelario's appeals had been exhausted," but at trial stated

that she could not remember what Mr. Bobonis told her (Docket No. 355 at p. 69).  Mr. Bobonis, for his part, claims that he did not tell Ms. Colón that the matter had been resolved on the merits.  Id. For Candelario, UBS was engaged in misrepresentation or concealment (Docket No. 356 at p. 7).

- In addition, Candelario points out that close to five (5) years ago, within weeks of the date its principal brief was due before the First Circuit, UBS presented a motion requesting remand of the first appeal, making extraordinary, but completely unfounded, accusations against her, accusing her of failing to disclose payments which had been made by Efrón, which, according UBS, "at least in part, and perhaps in full – discharged his monthly payment obligations" (Docket No. 356 at p. 4).   According to UBS, Candelario had lied in her deposition when she stated in January of 2009 that she had not "been able to collect the money that UBS disbursed from the accounts, and that she had not "been able to receive the $50,000 [monthly payment]." Id.

- Likewise, UBS told the First Circuit that Candelario had "concealed information from both the district court and UBS-PR." (Docket No. 356 at p. 4).  Additionally, it asserted that Candelario obtained hundreds of thousands of dollars from Mr. Efrón that she never disclosed to the district court."  Id.  On that basis, UBS requested remand to the district court and a complete abeyance of the appeals, or in the alternative, a three month delay in the appellate process.  Id.  Then, after Candelario noted that UBS had not followed proper procedure with respect to the remand request, UBS filed a Rule 60(b) motion with the

district court, making the same accusations about Candelario with no apparent concern about whether they were true or false. <u>Id.</u> at pp. 4-5.

- This court (Casellas, J.) ruled that UBS's claims were patently false and had no support in the evidence (Docket No. 356 at p. 5). He observed that UBS utterly failed to do discovery on this point before the issuance of the summary judgment ruling in January of 2010. <u>Id.</u> In addition, he noted that UBS's assertions regarding Candelario's alleged misconduct were based on references which "distorted the import" of her testimony. <u>Id.</u> at 6. To that end, he observed that "UBS ha[d] no one but itself but itself [sic]... [for its] failed litigation strategy," and had engaged in "gamesmanship," which "no matter how well it comes cloaked," continues to be improper. <u>Id.</u> Finally, characterizing UBS's actions as a "jeremiad" constituting "nothing more than an ill-advised attempt to side step the effects of a failed litigation strategy," he denied Rule 60 relief. <u>Id.</u>

- Candelario contends that UBS misrepresented and concealed documents authored by Mr. Bobonis, to the effect that UBS should expect a written order (Docket No. 356 at p. 7). And she maintains that if Mr. Bobonis knew that an "order" would be issued, she could well have argued that his action three months later in counseling in favor of the release of restraints on the basis of an unsigned and unnotified minute was *per se* unreasonable and could have been determined unreasonable as a matter of law. <u>Id.</u> at 8. She claims that her entire litigation strategy was affected by this concealment, up to the last moment. <u>Id.</u>

- Additionally, Candelario mentions that since UBS did not produce that evidence until September 2014, she did not have the chance to inquire about this piece of evidence during the two days that she spent deposing Mr. Bobonis on September 27, 2013 and on August 6, 2014 (Docket No. 356 at p. 8). She labels UBS's explanation about late production as hardly satisfactory, noting that the day following its September 2014 production, her attorney (Ms. Berkan) wrote to counsel for UBS, expressing "surprise" at the documents, and characterizing the documents, which were clearly contemplated in earlier discovery requests, as a "game-changer." Id. at pp. 8-9. UBS' attorney (Mr. Manning) explained that Ms. Colón had just found these documents in "a different box" at UBS. Id. at p. 9. According to Candelario, UBS' witnesses contradict the new evidence provided to her on the eve of trial, which demonstrates that Mr. Bobonis's view, at the time of the events, was that a written order would be necessary. Id. at p. 11.

In the end, Candelario complains that throughout this litigation, UBS has been obstinate, providing misinformation to the court, withholding documents, and provoking unwarranted delays; and has attempted to take advantage of the fact that she has limited resources and has been living on borrowed money, insufficient to pay mounting litigation expenses (Docket No. 356 at p. 11). For that reason, she asks the court to impose the sanctions provided under Rule 44 of the Puerto Rico Rules of Procedure. Id.

### 2. UBS' Perspective

UBS alleges that it has acted diligently and reasonably in litigating issues of first impression (Docket No. 358 at p. 1). It claims that much of the time elapsed in this case is due to

factors beyond either party's control and not because of any alleged misconduct by UBS. Id. at p.

8. In that regard, it points out that:

- In late 2008 and early 2009, the parties conducted initial discovery and then filed cross-motions for summary judgment. By July 2009, those motions were fully briefed. But due to the court's decision to certify an issue to the Puerto Rico Supreme Court, the court did not decide the motions for another six months, until mid-January 2010 (Docket No. 358 at p. 8).

- After UBS filed a notice of appeal, Candelario filed a Rule 59(e) motion seeking to expand her damages award. This resulted in another two months of motion practice before the court denied Candelario's motion in April 2010 (Docket Nos. 93 and 105. Plaintiff then cross-appealed (Docket No. 358 at p. 8).

- In July 2010, Judge Casellas issued an order indicating that he was inclined to partially grant UBS's Rule 60(b) motion as to damages. However, it was not until five months later, in December 2010, that the First Circuit issued a remand order (Docket No. 358 at p. 8).

- Following the initial remand, even Candelario agreed that some limited discovery was appropriate. Nevertheless, Judge Casellas stayed discovery pending an anticipated ruling in the local court proceedings between Candelario and Efrón. Prior to such ruling, however, Efrón had filed for bankruptcy. And UBS played no part in that decision (Docket No. 358 at p. 8).

- Even though Judge Casellas denied UBS's Rule 60 motion, he (and Candelario) agreed with UBS that the first amended judgment contained an error, and he amended the judgment accordingly (Docket No. 358 at p. 8). From UBS'

perspective, Judge Casellas ultimately rejected its motion not because of obstinacy but because the facts identified by UBS did not meet the stringent requirements of Rule 60(b) to be considered "newly discovered evidence" or "clear and convincing evidence of misconduct." Id. at p. 10.

- After Judge Casellas reinstated judgment in October 2011, it took over a year, until December 2012, for the First Circuit to hear oral argument, vacate the summary judgment against UBS, and return the mandate to this court (Docket No. 358 at p. 8).

- Subsequent to remand, UBS promptly requested mediation on the ground that "it would be financially wiser to have mediation first and then, if needed, [the parties should] reopen discovery" (Docket No. 358 at pp. 8-9). The parties scheduled a March 5, 2013 mediation. Id. at p. 9. UBS advised Efrón of the mediation and that it was prepared to enter into a reasonable settlement. But the mediation was unsuccessful. Id. Then the parties agreed upon a proposed schedule for the remainder of discovery, with a proposed trial date in November or December 2013. Id. In a joint filing, the parties stated that they "feel that they can continue to have productive discussions directly." Id.

- In September 2013, several weeks before the discovery deadline, Judge Casellas recused himself from the case (Docket No. 358 at p. 9). That same month, the parties filed a joint motion for a status conference. Id. The parties agreed that they had been working cooperatively, that a status conference would be helpful, and that they each wanted to take additional discovery. Id.

- In November 2013, Candelario filed a motion to continue the pretrial conference because the case had been recently reassigned to another judge (Cerezo, J.) and because of a professional conflict of Candelario's attorney (Docket No. 358 at p. 9). Ultimately, a status conference was scheduled for February 28, 2014 to allow Judge Cerezo "more time to become duly informed regarding issues in this case before meeting with the attorneys." Id.

- One month later, on March 27, 2014, the case was transferred to the current presiding judge (Docket No. 358 at p. 9). The case then proceeded expeditiously and with no delays.

UBS argues that the length of this case is not due to "obstinacy" by UBS, but to circumstances attendant to complex litigation: engaging in discovery, awaiting decisions of motions and appeals, dealing with issues of first impression, coordinating with the court regarding multiple re-assignments of presiding judges, pursuing mediated resolutions, and ultimately, attempting to accommodate schedules of counsel and the court (Docket No. 358 at p. 12). It points out that this is precisely the opposite of "obstinacy." Id. Similarly it states that rather than impose new burdens on Candelario it instead sought to address her concerns in a reasonable and efficient manner, Id. at p. 11, and denies engaging in dilatory or stalling tactics, denying a fact knowing that it is true, or disregarding court orders, any one of which instances may justify sanctions under Rule 44.1(d) and Rule 43.b(3). Id. at p. 12.

### 3. Assessment

A finding of obstinacy requires that the court determine a litigant to have been unreasonably adamant or stubbornly litigious, beyond the acceptable demands of the litigation, thereby wasting time and causing the court and the other litigants unnecessary expense and delay.

See, In re Redondo Construction Corp., 700 F.3d 39, 43 (1st Cir. 2012); De León López v.

Corporación Insular de Seguros, 931 F.2d 116, 126 (1st Cir. 1991)(same).   An assessment of

obstinacy must be made within the context of the case as a whole, taking into account the case's

personality.   Dopp, 38 F.3d at 1253-1254.  So viewed, UBS was not obstinate or vexatious.

       The case comes out of an acrimonious and long-running litigation related to a high-stakes

divorce, presenting an issue of first impression.   That issue does not preclude liability because it

took place in a context where UBS should have realized that its decision to release the restraints

on the accounts was unreasonably premature, with the predictable consequence of harming

Candelario.   But it cautions against sanctions, for in general, where novel issues are raised, a party

cannot be held to have acted in an obstinate manner.   Riofrio Anda v. Ralston Purina Co., 772

F.Supp. 46, 54 (D.P.R. 1991), aff'd 959 F.2d 1149 (1st Cir. 1992).   That said, existence of novel

issues does not give a party carte blanche to act in an obstinate manner, IOM Corporation, 627

F.3d at 453.   Yet UBS was successful in persuading the First Circuit to reverse an adverse summary

judgment.   And the First Circuit remanded the case for trial without awarding costs to either party.

Candelario, 699 F.3d at 107.

       UBS' relative change in its post-remand position such as Candelario has described reflects

the First Circuit's framing of the issues to be decided rather than inconsistent and contradictory

positions found relevant in evaluating whether a party has been obstinate.   See, IOM Corporation,

627 F.3d at 452-453 (referring to party's inconsistent and contradictory positions in sustaining

award of attorney's fees under Puerto Rico law).   While it is true that UBS attacked Candelario by

way of the Rule 60(b) motion, and that the then presiding judge (Judge Casellas) concluded that

UBS had engaged in gamesmanship, Judge Casellas ultimately accepted UBS' argument that the

judgment contained an error related to interest, and amended the judgment accordingly without sanctioning UBS.

As to Mr. Bobonis' email of November 2006 to UBS, UBS' explanation for the belated discovery is not far-fetched.  When Ms. Colón found the document she immediately forwarded it to UBS' record counsel, who in turn disclosed it to Candelario's attorney.  Under a more effective filing system, the document should have been located much earlier either within UBS' or Mr. Bobonis' file.  Nevertheless, it is uncertain what effect knowledge of its content would have had in the litigation, particularly in light of the fact that Candelario prevailed at summary judgment.

Finally, much of the time elapsed is more properly attributed to factors not uncommon in complex litigation beyond either party's control rather than misconduct by UBS.  Considering the totality of circumstances, the court is persuaded that sanctions should not be imposed on UBS under Rules 44.1(d) and 44.3(b) of the Puerto Rico Rules of Civil Procedure.

## IV.    CONCLUSION

To err is human.  Alexander Pope, *An Essay on Criticism* (1711).  UBS made a mistake, crossing the line in a situation that makes it negligent.  It knew that the CFI had ordered it to restrain Efrón's accounts in October 2006, and that there was a subsequent oral order in November 2006 vacating the attachment order.  Its attorney informed that the order had been orally vacated, stating that UBS should expect a written order in the future.

In the meantime, Efrón wanted the restraints lifted.  So in February 2007 he gave UBS a copy of a facially invalid minute, not signed by any judge.  Along with the unsigned minute, he provided UBS with copy of the Mandamus Petition that Candelario filed in the Court of Appeals in November 2006 with a motion in aid of jurisdiction, and more important, of the Court of Appeals' decision.  In that decision, the Court of Appeals made specific reference to Rule 32(b),

which expressly requires a judge's signature in minutes with resolutions or orders, which in turn must be notified to the parties.  Further, it stated that the oral order was not in a signed minute or notified order, and that the matter was under the consideration of the CFI, awaiting a written decision**.**

Focusing on the disposition rather than on the content of the Court's decision, UBS concluded that the attachment no longer existed, and released the restraints.  Its action was uncalled for.[40]  Surely UBS did not act with the specific intent of harming Candelario, but its witnesses could not persuasively explain why the restraints had to be released on the basis of a facially invalid minute, notwithstanding the picture that the Court of Appeals had clearly laid out in November 2006, a picture calling specific attention to the text of Rule 32(b), and to the fact that the oral order was not in a minute signed by a judge, that the minute had not been notified, and that the matter was under the consideration of the CFI, awaiting a written decision.  UBS should have evaluated the facially invalid minute against those parameters but did not.   Even more, as stated above, the unsigned minute mentions the attachment order, and payments owed to Candelario.  It states that payments had to be made immediately, but does not state that vacating of the attachment order was immediate.  The distinction was not reviewed for significance in light of the other materials that Efrón provided to UBS in February 2007.

With the benefit of having observed and heard the witnesses and examined the exhibits showing the parties' actions during the critical period, the court is persuaded that UBS did not

---

[40] Mr. Bobonis testified that Judge Sellés stated that UBS had complied with the order concerning the sale of assets.  Tr. II at p. 174:9-20.  Judge Sellés was responding to an informative motion UBS filed on September 5, 2007, after it provided the $351,783.19 check to Candelario. DX 65. UBS' motion does not state that in February 2007, some seven months earlier, UBS had lifted the restraints on Efrón's accounts.  On September 6, 2007, Candelario opposed the motion. DX 66.  At some point, it seems Judge Sellés issued an order to "show cause," as a result of which UBS filed a motion in compliance with order to show cause.  DX 68.  Again, the motion is silent on the fact that UBS removed the restraints in February 2007.  In this connection, Mr. Bobonis could not recall any discussion about the possibility of informing the CFI that the funds were released. Tr. II at p. 68:1-6.  UBS did not provide the CFI with a complete description of the events in question.

review the documents for their substantive content. Whatever review it conducted was empty. UBS was concerned about Efrón, for at some point he had threatened UBS over UBS' handling or mishandling of a discovery matter related to the state case involving Candelario. To protect itself from Efrón, however, UBS could have filed a concise motion setting forth the elements that the Court of Appeals had pointed to, seeking guidance from the CFI just as it had done previously in the same litigation. As noted above, the cost would have been minimal – perhaps no more than $175 (the equivalent of one hour of Mr. Bobonis time) – compared with the potential liability it would face if found negligent (in excess of $4 Million). Instead, it released the restraints. Candelario is not to blame for those decisions; UBS is. Hence, the court finds by a preponderance of the evidence that:

- UBS was negligent: its decision to release the accounts to Efrón in February 2007 unreasonably generated and overlooked foreseeable risk of loss to Candelario.

- UBS' negligence caused damages to Candelario: as of today, adjusted by the amount that Candelario has been able to recover from Efrón since 2001, those damages amount to $4,725,629.

- UBS' obligation includes state interest as part of the local judgment to which it corresponds, which accrues at a rate of $26,550 per month; in addition, the obligation generates federal interest from entry of judgment until fully satisfied.

- Candelario was not negligent; no downward adjustment is required in the amount UBS is liable for.

- Candelario's action is not time-barred.

- Even though UBS was negligent, it was not obstinate or vexatious to the point of justifying an award of attorney's fees and prejudgment interest against it.

Candelario Del Moral v. UBS
Civil No. 08-1833 (PAD)
Opinion and Order
Page 72

**SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March, 2016.

S/Pedro A. Delgado-Hernández
PEDRO A. DELGADO HERNANDEZ
U.S. DISTRICT JUDGE